## Case No. 604.

### ATKINS et al. v. PETERSBURG R. CO.

[3 Hughes, 307.] [1]

Circuit Court, E. D. Virginia. July Term, 1879.

RAILROAD COMPANIES—RECEIVERS—ADVANCES TO MEET WAGES PREFERRED TO MORTGAGES.

When the company defendant was in difficulty, before the appointment of a receiver, from its employes threatening to strike for the nonpayment of wages due for months past, and on appeal by its officers to the petitioners, who were holders of bonds, they advanced the money necessary for the payment of the back wages due, on a distinct understanding that they should be reimbursed out of the first net earnings of the company, and that the money advanced should be paid to the employes; and afterwards, before their reimbursement, the road went into the custody of the court under the appointment of a receiver. Held, that the advances must be paid in preference to the claims of mortgagees, out of income accruing while the road was in the custody of the court.

[See note at end of case.]

In equity.

Frank W. Christian, for petitioners.

H. H. Marshall and J. Wesley Friend, for the trustees of the mortgagees.

HUGHES, District Judge. The petitioners, Hiram Sibley, John B. Davis, Thomas Wilson, and J. D. Evans, ask for payment, in preference to bonds held under first and second mortgages, of certain moneys advanced to the president of the Petersburg Railroad Company, after default in payment of certain coupons and before the filing of the bill for the appointment of a receiver. The advance was made on an understanding with the president and directors that they should be paid out of the first net current revenues, and that the amount advanced should be used in paying off back wages due to the employes of the company. Each of the petitioners had at the time of the advance second mortgage bonds of the company, each of them except Davis was a stockholder, and Davis had made large advances to one Ragland, personally, on a pledge of shares owned by Ragland, who, until recently before the advances of the petitioners, had been president of the company. Some time in the first half of the year 1875, Ragland resigned, a new board of directors were appointed, and another president was elected. Davis and Sibley were elected members of this new board in their absence, and I believe against their consent, but Sibley refused to serve, and though Davis protested against being assigned to the position, he never actually resigned. Davis held the additional relation to the company of a trustee with Thomas Branch in the deed securing the second mortgage

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

bonds. Isaac H. Carrington was elected president.

Shortly after this reorganization of the company its affairs came to a serious crisis in the form of a threatened strike of its employes for wages in arrears. The amount of the arrearage was about $27,000, and it was necessary for the new president to raise this sum of money without delay. In his extremity he appealed to the petitioners to advance the amount needed. Although the fact is disputed by J. Wilcox Brown, trustee in the first mortgage, and by Thomas Branch, trustee in the second mortgage, who resist this petition, the evidence that that was the object of the petitioners in making the advance, and that they made it on a specific appeal from President Carrington for that particular purpose, is conclusive. Moreover the evidence shows that the advance was made for this object on an understanding between the petitioners and President Carrington, approved by all of the directors but one, who was absent from sickness, that they should be reimbursed their advance out of the first net earnings of the road. The amount advanced was $26,500, and it was paid by the petitioners at several dates, from July 28th to August 6th, 1875. This particular fund was deposited in the Planters' National Bank of Richmond, of which Davis was president; the current earnings of the company were deposited in other banks. In his letter relating to the advance, dated in New York, 26th July, 1875, Mr. Sibley said to President Carrington: "This amount is to pay the men on the road. I regard the labor on the road as the first lien on the property. Mr. Davis will give you an equal amount, which will pay or nearly so, the arrears. I want you to send me your receipt for the ten thousand and a certificate that Mr. Davis has paid an equal amount for the purpose, with an agreement that these advances by me and Mr. Davis are to be refunded to us in equal amounts out of the first net profits of the road. It is desired that the men be paid off at once, in order that any may be discharged that are not wanted, etc."

The reply of President Carrington to this letter is not given in the evidence, and if ever sent in writing, would seem to have been lost. But letters from him to Mr. Sibley are in proof, written in November and December following. In that of November 1st, 1875, Mr. Carrington says: "So far as respects the $20,000 advanced by Mr. Davis and yourself, and the $6500 advanced by Evans and Wilson, I look upon them as debts standing upon a different footing from all other debts of the company. They are for cash advanced to the company without security, at a time when it was necessary to the life of the company, etc." In a long letter of November 23d, explaining his financial plans and efforts, Mr. Carrington uses similar language, and in his letter of Decem-

ber 29th, 1875, the same officer says: "Mr. John B. Davis has demanded that the first payments to be made, over and above actual running expenses, shall be, upon the four loans, made to the company which are unsecured, viz.: $10,000 by you, $10,000 by J. B. Davis, $3250 by Thomas Wilson, and $3250 by Evans. I acquiesce in this. I suppose you and Mr. Davis understand each other. I expect to send you a check for $2000 during this week, and to pay Mr. Davis a similar amount, and my expectation is to pay you both $3000 more by February 1st, making $5000 to each in part of above loans."

Mr. Davis, in his deposition, says: "The advance was for the purpose of paying off the employes of the road, and the agreement by the president, Mr. Carrington, was that it should be repaid out of the first earnings of the road." Isaac H. Carrington says, in his testimony: "I was elected president of the Petersburg Railroad Company on the 19th of July, 1875. The road at that time was in very bad condition; the iron was so much worn as to render travel unsafe; the ditches were generally filled up; there were many unsound ties in the track; the rolling stock needed repair; there were very few laborers employed as track hands; many of the employes had brought suit for their wages and recovered judgments in North Carolina. Two engines of the company had been levied on under executions on these judgments, and were in possession of the sheriff; other judgments had been obtained against the company in Virginia; the company was without credit, and its operations were suffering for want of necessary supplies of all kinds. Amounts due to the company from connecting roads had been attached at Baltimore. A few weeks before my election as president, I had made a full examination of the affairs of the road. On my election I represented to John B. Davis and Hiram Sibley in person, and to other stockholders by letter that the condition of the road rendered an immediate advance of money necessary. There were past due wages to employes amounting to between $27,000 and $29,000, and I told them that it would be impossible to manage the road with any success unless payment was made to these employes. I also represented the absolute necessity for immediate outlay on the track and rolling stock; also, that there were debts due and secured by collateral, and that there was imminent danger that the collateral would be sacrificed at forced sale. Four of the stockholders responded to this appeal by making the following advances (these have been already stated). There was no written contract stipulating the terms or conditions of this loan. There was an understanding that the object of the loan was to enable me to pay wages, and my recollection is that Hiram Sibley particularly insisted that his money should take that direction. I executed the notes of the com-

pany at four months (I think), and they were renewed at maturity. I resigned the office of president in January, 1876, and do not know what was done with these notes afterwards; our distinct understanding with these gentlemen was that theirs was to be considered a debt of the highest obligation, and I stated to them that if they loaned the money, and I afterwards found that I could not get on with the road, I would devote its receipts to the payment of these notes. I file as part of my deposition three letters, etc. (describing the three letters already quoted from, written by himself to Sibley in November and December, 1875)."

As tending to show that this was not the understanding on which the advances in question were made by petitioners, the defence produce the account of the company with the Planters' National Bank, of which Mr. Davis was president, from which it appears that this specific money was not all paid specifically in discharge of wages in arrear, but went in part to other purposes, and especially that $5000 of it were paid to the counsel of a judgment creditor of the road, in part payment of his debt (paid as the evidence shows without the knowledge of Davis). This creditor was the one on whose bill for foreclosure, this court appointed a receiver and took possession of the road in May, 1877; but under a consent decree. This matter is referred to by Mr. Carrington in his testimony in answer to a question by the defence, whether all the money advanced by Davis, Sibley, Wilson, and Evans was applied to the payment of back dues to the employes of the company. Mr. Carrington says: "It was not. On the 29th of July, 1875, I paid, in part of the judgment for wages due in Weldon, $3777; and on the 7th of August, 1875, I paid $6500 on pay rolls for the months of June and July, 1875. The policy I adopted and which I followed as long as I was president was, to pay current wages as they matured, and thus carry the payments back month by month as I was able.... When I received these loans I deposited them in the Planters' National Bank of Richmond.... Under the arrangements under which I borrowed this money I did not consider myself bound to apply this identical money to the payment of wages; but, if there was pressing necessity from other directions, I felt at liberty to use this money for that purpose, thus relieving current receipts, and looking to current receipts to replace it. I did feel bound to apply an amount equal to these loans to back wages, and continued to make such application from time to time during my presidency. The payment of the pay rolls for June and July, and the partial payment of the judgments of Weldon entirely restored the confidence of the employes, and they were willing to wait, I giving frequent assurances that I would continue the payment as fast as I could."

It would seem in short that the back wages for which the advances were made by the petitioners were all paid off in the course of time, but not in whole with the specific money advanced for that specific purpose, and deposited in the Planters' National Bank. A great deal of the testimony put into the case by the defence (in fact much the greater part of it) relates to the history of the difficulties of the company subsequent to this advance of money, to transactions directly or indirectly connected with the subsequent filing of the bill in this court for the appointment of a receiver, and to the history of the bill between the time it was filed in the summer or fall of 1876 and the appointment of a receiver in May, 1877. But I do not think that this testimony at all affects the case as it appears from the letters of Carrington and Sibley that have been referred to, and the testimony of Carrington and Davis that has been given. The fact seems to be conclusively proved that on the part of the petitioners, their money was advanced for the specific purpose of keeping the road running by the payment of arrears due its employes, and that though all the money deposited in the Planters' National Bank was not specifically used for that one purpose, yet that the equivalent of any particular part of that money which was otherwise used by the president was paid to the employes out of current receipts in time to satisfy the employes and accomplish the object for which it was advanced by the petitioners. When I further state that the net current earnings of the road for any three or four months since the petitioners advanced the money, would have been sufficient to pay off the advance, I believe that I have stated all the facts of the case material to its decision. Although this suit was originally brought by a judgment creditor, yet the decree appointing a receiver was given by consent, and the trustees under the mortgage deeds at once came in by cross-bill, and took the position of domini litis in the cause.

The questions presented by the petition are: 1st. Whether, under any circumstances, the advance of moneys to keep a railroad running without the exaction of security, can entitle the creditor to payment out of the earnings of the road in priority over the claims of mortgagees, and if this can be done in any case? 2d. Whether the circumstances under which the petitioners in this case advanced the money which they now ask the court to repay to them, are such as will justify the court in granting their petition?

The trustees who contest the claim of these petitioners rely upon the priority of their mortgages and the sanctity of their rights, as secured creditors, under solemn deeds. They vouch in support of the superiority of their rights the decision of this court in the Atlantic, Mississippi and Ohio

Railroad Case, [Skiddy v. Atlantic, M. & O. R. Co., Case No. 12,922,] upon the petition of the Pennsylvania Steel Company, of sundry creditors holding assigned labor claims, and of sundry other holders of unsecured debts against that defendant company. I concurred in the decision in that case, 1st, Because the principal part of the claims then passed upon did not present the peculiar equities about to be discussed; and, 2d, Because, as to the rest of those claims, the weight of authority seemed at that time to preponderate in favor of mortgage creditors as against unsecured creditors of every name. Since then the supreme court of the United States has had this whole subject before it in a group of suits connected with the Chicago, Danville and Vincennes Railroad Company, in which it has passed upon the rights of a variety of petitioners having claims adverse to the mortgagees of that railroad. Its decrees in the various petitions and suits referred to are the more important because they were made after a general invitation had been extended to members of the bar of that court interested in like cases, to present briefs on the questions arising in that case; and because, after a most patient hearing and the most searching and able argument from the best legal minds of the country, the court arrived at unanimous conclusions on this delicate, difficult, and important subject. In the principal case before it, connected with the railroad mentioned, that of Fosdick v. Schall, [99 U. S. 235,] the court, through Mr. Chief Justice Waite, announced its views of the law in the following paragraphs, which though they fall within the characterization of dicta, yet are in fact a careful and deliberate expression of what the court considered to be the law of this whole subject. Nor is there any reason to doubt but that it will apply the principles indicated to cases which will come before it hereafter. In the case of Fosdick v. Schall, [Id.,] the court, in the course of its decision, said as follows: "We have no doubt that when a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property, as may under the circumstances of the particular case appear to be reasonable. Railroad mortgages are comparatively new in the history of judicial proceedings. They are peculiar in their character, and affect peculiar interests. The amounts involved are generally large, and the rights of the parties oftentimes complicated and conflicting. It rarely happens that a foreclosure is carried through to the end without some concessions, by some parties, from their strict legal

rights, in order to secure advantages that could not otherwise be obtained, and which it is supposed will operate for the general good of all who are interested. This results almost as a matter of necessity from the peculiar circumstances which surround such litigation. The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as the necessities of the case require; and when companies become pecuniarily embarrassed it frequently happens that debts for labor, supplies, equipment, and improvements are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings which ordinarily should go to pay the daily and monthly expenses are kept from those to whom in equity they belong, and used to pay the mortgaged debt. The income out of which the mortgage is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipments, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment, something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income, and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees. In this way the court will only do what, if a receiver should not be appointed, the company ought itself to do; for, even though the mortgage may in terms give a lien upon the profits and income until possession of the mortgaged premises is actually taken or something equivalent, the whole earnings belong to the company, and are subject to its control. The mortgagee has his strict rights, which he may enforce in the ordinary way. If he asks no favors, he need grant none; but if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity. The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion, and the chancellor should so mould his order that while favoring one, injustice is not done to another. If this cannot be accomplished, the application should ordinarily be denied. We think, also, that if no such order is made when the receiver is appointed, and it appears in the progress of the cause that bonded interest has been paid, additional equipments provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies, and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business. This, not because the creditors to whom such debts are due have in law a lien upon the mortgaged property or the income, but because in a sense the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and stockholders; and if they give to one class of creditors that which properly belongs to another, the court may, on an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. While ordinarily this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way. Thus it often happens that in the course of the administration of the cause the court is called upon to take income, which otherwise would be applied to the payment of old debts, for current expenses, and use it to make permanent improvements on the fixed property, or to buy additional equipments. In this way the value of the mortgaged property is not unfrequently materially increased."

These principles strike my mind as self-evident. I do not think they can be successfully controverted. More briefly stated they are these: The possession of a receiver is only that of the court whose officer he is, and adds nothing to the previously existing title of the mortgagees. He holds, pending the litigation, for the benefit of whomsoever in the end it shall be found to concern, and in the meantime the court proceeds to determine the rights of the parties upon the same principles as if no change of possession had taken place. When a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property, as may, under the circumstances of the particular case, appear to be reasonable. If the court should not do this in the decree appointing a receiver, it may enforce these equities against mort-

gagees, in proper cases in later decrees. The income out of which the mortgage is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements; and every railroad mortgagee, even of earnings, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. The mortgagee has his strict rights, which he may enforce in the ordinary way. If he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may be required to submit to the operation of the rule requiring that he shall do equity in order to get equity.

In general the opinion holds that a court may for certain purposes stand in the shoes of the company whose property it has sequestrated, and satisfy equities which the company necessarily contracted for the benefit of all parties interested in keeping the railroad alive and in operation. The opinion does not go to the extent of allowing the court to touch the corpus of the mortgaged property for the purpose of discharging the equitable claims described; but limits it to the earnings as the fund out of which they are to be paid. It virtually requires that the court shall pay these claims out of income earned, while the road is in its custody, forbidding it to fix them as a permanent charge upon the property after it passes out of its custody. The reasoning of the opinion covers cases only of the strongest equity and clearest good faith. It does not cover any expenditures but such as were of urgent necessity, and as inured to the benefit of all parties interested in the property. While the supreme court is thus severe as to the character of the claims which may be paid, and as to the funds out of which payment is to be made; yet it does not limit them to the payment of wages due employes. It allows the expenses of permanent improvements to be refunded where those improvements were necessary to render the road safe for public use, and when the credit for them was incurred on the faith of their being paid for out of current earnings. There was no such pledge of faith given in the case of the Pennsylvania Steel Company, nor in favor of the holders of assigned labor claims in the Atlantic, Mississippi and Ohio Case, which has been referred to. The supreme court, in its opinion under consideration, makes a broad distinction between railroads (which the interests of all classes of creditors and good faith to the public who charter them for public purposes, alike require to be kept going and alive) and other property. It intimates that a court may order the payment of such debts incurred by a railroad company before the appointment of a receiver, as it may authorize a receiver to contract and pay after his appointment; provided that the corpus of the property be not touched.

Now it has never been questioned that a receiver may apply so much of the current income as may be necessary for repairing or operating the road, or may, by receiver's certificates, anticipate the future income for that purpose; and it would be difficult to draw a distinction between the principles under which a court authorizes a receiver to make necessary expenses for operating a railroad and keeping it in a safe condition, and the principles embodied in the language quoted from the opinion of the supreme court, relating to sundry expenses of the railroad companies incurred before the appointment of receivers. The cases where the power to issue receiver's certificates has been denied, have been where they were to be issued, not for the preservation, but for the improvement of the property. Courts have in some instances gone even to the length of authorizing permanent improvements where the circumstances of the case called for the exercise of the power; but the opinion of the supreme court in Fosdick v. Schall, [99 U. S. 235,] does not go that far. It is enough for us that no court has ever refused to issue such certificates when it was necessary for repairing the road or keeping it agoing as a safe road; and if it may authorize such expenditures by a receiver, it may pay them if they have been made by the company before the appointment of a receiver.

Mr. Jones, who cannot be said to lean against the rights of bondholders, in his work on Railroad Securities, (section 537,) says: "When it is necessary for a receiver to raise money for the purpose of repairing or operating a railroad, the court may authorize him to issue negotiable certificates of indebtedness, which shall constitute a first lien of the property or the proceeds of it, and shall be redeemable within a limited time, or when the property is sold by the court." And, at section 542, he says: "The court has power, while in possession of property, to protect it from loss and destruction, and to preserve it in the condition in which it was received; and for this purpose it may authorize the expenditure from the property itself of whatever is absolutely necessary for its preservation, and may do this as against any and all parties interested."

These propositions are fully sustained by the cases of Kennedy v. St. Paul, etc., R. Co., [Case No. 7,706;] Meger v. Johnston, 53 Ala. 237; Hoover v. Montclair, etc., R. Co., 29 N. J. Eq. 4; Jerome v. McCarter, 94 U. S. 734; Vermont & C. R. Co. v. Vermont Cent. R. Co., [50 Vt. 569,] stated in Jones, Ry. Sec. § 536; Stanton v. Alabama & C. R. Co., [Case No. 13,296.]

It seems to me that the equity of the petitioners, Sibley, Davis, Wilson, and Evans, falls within the reasoning of the supreme court. In consequence of the non-payment of their wages the employes of the Peters-

burg Railroad Company were greatly dissatisfied, and it was found that in order to retain their services some provision must be made to satisfy their just claims. Many of them had instituted suits and recovered judgments for their wages. In these suits they had attached property of the company and garnished debts due to it. The officers of the company recognized that for the efficient operation of the road, it was absolutely essential that these claims should be satisfied. But the company had neither money nor credit. In this state of things the petitioners made these advances, at the request of the president of the company. For it they received no consideration, and from it they derived no peculiar or private benefit apart from the general advantage accruing to the railroad. The advance enabled the company to continue its operations, and it inured to the general advantages of all concerned in its success. In July, 1875, the alternative presented was, that these advances should be made or the road be judicially sequestrated. The petitioners believed it could be extricated from its difficulties, and most probably it could have but for the discredit and embarrassment of the company produced by subsequent legal proceedings against it. The petitioners did not desire a receiver, and proved their bona fides by this advance of their money. But even if a receiver had been appointed in July, 1875, the first thing that would have confronted him would have been these wages. To run the road it would have been necessary to pay them. They had a claim on the road which the court would have provided for; and the company having no money, the first thing necessary for the court to do would have been to authorize the receiver to issue certificates to raise money to pay these wages, i. e., to raise the money which was supplied by these very advances. As equity regards the substance and not the form, these advances must be treated as preferred debts. The employes had a claim on the road which it was absolutely essential to the interests of all should be satisfied. These petitioners came forward on an appeal from the president, and advanced their private means, as one of the witnesses said, to save the life of the company. They were not speculators, but persons acting for the benefit of a concern in which they had a deep interest. The right of the mortgagees to have the fund realized by the receiver applied to their debts, is equitable only; and should not be so enforced as to produce inequity. The court in a proper case is bound to attach to its enjoyment such conditions as are right and just. It would be highly inequitable to refuse to pay advances made for the benefit of mortgagees by men whom the servants of the mortgagees promised to refund out of current earnings. This court, when it appointed a receiver, might have done so upon the just and reasonable condition that those claims were to be provided

for; and, according to the opinion of the supreme court, it may equally do so by an order subsequently made, operating by way of modification of the original order. See, also, Douglass v. Cline, 12 Bush, 608. I will therefore make an order granting the prayer of these petitioners.

[NOTE. Other decisions that wages of employes, accruing prior to the appointment of a receiver, should have priority over the claims of mortgagees or other lienholders, are as follows: Turner v. Indianapolis, B. & W. Ry. Co., Case No. 14,258; Taylor v. Philadelphia & R. R. Co., 7 Fed. 377; Union Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. 295; Olyphant v. St. Louis Ore & Steel Co., 22 Fed. 179; Miltenberger v. Logansport, C. & S. W. R. Co., 106 U. S. 286, 1 Sup. Ct. 140; Dow v. Memphis & L. R. Co., 20 Fed. 260; Blair v. St. Louis, H. & K. R. Co., 22 Fed. 471.]