## LACKAWANNA IRON AND COAL COMPANY v. FARMERS' LOAN AND TRUST COMPANY.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 22. Argued March 10, 1899. — Decided January 29, 1900.

The principles announced in *Southern Railway Co.* v. *Carnegie Steel Co.*, *ante*, 257, reaffirmed; but the claims filed in this suit were held not to be current debts chargeable upon the current receipts of an insolvent railroad company in the hands of a receiver in preference to the claims of mortgage creditors.

THE Houston and Texas Central Railway Company, a corporation of Texas, formerly owned and operated in that State several lines of railroad, as follows: From Houston to Denison, a distance of 345 miles, known as the main line; from Hempstead, on the main line, to Austin, a distance of $118\frac{3}{4}$ miles, known as the Western Division; and from Bremond, on the main line, to Ross, a distance of 58 miles, known as the Waco and Northwestern Division. It also owned lands donated by the State in aid of the construction of its roads.

Prior to April 1, 1881, the Company had executed various mortgages or deeds of trust, namely: 1. A mortgage dated July 1, 1866, covering the main line and ten sections of land for each mile, known as the main-line first mortgage, in which Easton and Rintoul were substituted trustees. 2. A mortgage dated December 21, 1870, covering the Western Division and ten sections of land for each mile thereof, commonly known as the Western Division first mortgage, in which the same persons were substituted trustees. 3. A mortgage dated June 16, 1873, covering the Waco and Northwestern Division (to be hereafter referred to as the Waco Division) and also 6000 acres of land for each mile thereof, commonly known as the Waco and Northwestern Division first mortgage, in which the Farmers' Loan and Trust Company, a New York corporation, was trustee. 4. A mortgage dated October 1, 1872,

covering the main line and Western Division as a second mortgage and 3840 acres of land per mile of completed road, commonly known as the main line and Western Division consolidated mortgage.  5. A mortgage dated May 1, 1875, commonly known as the Waco and Northwestern Division consolidated mortgage, and covering the Waco Division and 6000 acres of land per mile of completed road.  6. A mortgage dated May 7, 1877, commonly known as the income and indemnity mortgage, and covering all the property of the Railway Company.  7. A mortgage dated April 1, 1881, commonly known as the general mortgage, and covering all the property of the Company.

The present suit, designated in the Circuit Court by the number 227, was brought April 6, 1889, by the Farmers' Loan and Trust Company to obtain a decree of sale of the property covered by the mortgage of June 16, 1873, on the Waco Division.  On the same day Charles Dillingham, who was already receiver and in possession of the railway property of the Houston and Texas Central Company, was appointed receiver of all the railway property and property covered by the first mortgage of the Waco Division with power to operate the same, and was directed to keep separate accounts of the expenditures and earnings of that Division.

During the progress of the cause the Lackawanna Iron and Coal Company, a Pennsylvania corporation, intervened by petition, asserting an equitable lien, prior to the claims of bondholders, on the mortgaged property for the value of steel rails alleged to have been furnished by it and laid on the Waco Division.  Subsequently the Pacific Improvement Company, a California corporation, became the assignee of the claim of the Lackawanna Company, and was made a coplaintiff with the latter company.

From a report made January 13, 1896, by a special master appointed to find and report upon the subject-matter of the intervening petition, the following facts appear:

Pursuant to a written contract with the Houston and Texas Central Railway Company, dated December 28, 1882, the Lackawanna Company in the year 1883 delivered to the

former 5020 tons of steel rails at the price of $40.40 per ton, in payment for which the Lackawanna Company received ten promissory notes of the Railway Company, payable at six months from their respective dates, amounting with interest to $206,932.16. These notes were all paid either at their maturity or at the maturity of other notes given in renewal thereof.

Pursuant to another contract dated April 26, 1883, between the Lackawanna Company and the Railway Company, the former delivered to the latter in the year 1883, 5009 tons of steel rails at $39.50 per ton, and received in payment therefor the Railway Company's ten promissory notes dated respectively June 21, 22 and 23, 1883, August 10, 14 and 15, 1883, and September 6, 11, 15 and 20, 1883, each payable six months after date, and aggregating, with interest, $201,346.64 — the Railway Company being entitled, under the contract, to renew the notes at maturity for a further term of six months by paying the interest at six per cent or adding the interest to the new notes. As these notes matured, the payment of so much of the debt as was not satisfied at maturity was extended until, in process of settlements and extensions, the Railway Company, in the satisfaction of the balance due the Lackawanna Company under the contract, executed its eight promissory notes payable four months from their respective dates, with six per cent interest from maturity. These notes aggregated $118,000. In the negotiations resulting in this settlement the Lackawanna Company demanded that the Railway Company should secure the renewal notes by the hypothecation of collaterals. In compliance with that demand the Railway Company deposited with the Lackawanna Company, when the renewal notes were delivered, 170 first mortgage bonds of the Galveston, Harrisburg and San Antonio Railway Company of the face value of $170,000. At the date of the master's report, January 13, 1896, the value of those bonds was $157,250, or 92½ per cent of their face value. They were in the possession of the Pacific Improvement Company, as assignee of the Iron Company. No interest on the bonds had been collected by the Iron Company or by the Railway Company, but the

interest had been collected by the Southern Development Company. It was agreed before the special master by the parties in interest that the court should consider the 170 bonds as sold for $157,250 on December 23, 1895, and should credit that sum, as of that date, upon the claim of the Iron Company or of the Southern Development Company.

On the 30th day of October, 1883, — nearly *six years before the present foreclosure suit was brought,* — the Lackawanna Company and the Railway Company made another contract in addition to those above mentioned, under which the former delivered to the latter, during the months of February, March, April and May, 1884, 8552 tons of steel rails. That contract was similar in its general terms to those of December, 1882, and April, 1883. It provided for the delivery by the Lackawanna Company of 10,000 tons of Bessemer steel rails at $36.60 per ton, as nearly as practicable between February 1 and August 1, 1884, at the rate of 1500 to 2000 tons per month. It also provided that upon the delivery of each 500 tons of rails payment should be made therefor either in cash or in the notes of the Railway Company payable at six months from the average date of delivery, with six per cent interest from such date, the purchaser to have the privilege of renewing the notes before their maturity for a further term of six months by paying the interest or adding the same to the renewal notes. In March and April, 1884, the auditor of the Railway Company made a statement or voucher of rails then delivered under the contract. That statement passed into the hands of the treasurer of the Railway Company with a memorandum that notes were to be issued therefor payable at twelve months from their respective dates. In conformity with that memorandum the Railway Company executed and sent to the Lackawanna Company eight notes, payable twelve (instead of six) months from their respective dates. The latter Company thereupon notified the Railway Company of the error, but the notes as executed were received as a matter of accommodation to the Railway Company.

Afterwards, in April and May, 1884, the Railway Company, in settlement of the balance due for the 8552 tons of rails,

executed and delivered to the Lackawanna Company nine promissory notes payable at six months from their respective dates, with the option in the maker of renewal for a like term. Each of those notes were renewed for six months for like amount as the originals, and their aggregate amount was $327,175.50. This sum, added to the $118,000 above referred to, made $445,175.30, the aggregate principal amount due to the Lackawanna Company, not including the $157,250, the amount at which the 170 bonds delivered as collaterals were valued.

All the rails delivered under the first contract, and about one half of those delivered under the second contract, were paid for by the Railway Company prior to the appointment of any receiver of the property; but the remaining half under the second contract, and the rails furnished under the third contract, had not been paid for when the master's report was filed.

The second contract for rails was made one year and ten months prior to the appointment of the receiver in cause numbered 185 (to be hereafter referred to), about three years and three months prior to the appointment of the receiver in consolidated cause numbered 198 (to be presently referred to), and about six years prior to the appointment of the receiver in this cause. The third contract was made about sixteen months prior to the receivership in cause 185, about two years and nine months prior to the receivership in consolidated cause 198, and about five years and six months prior to the appointment of the receiver in this cause.

About 6.2 miles of the railway of the Waco Division (the part of the railway covered by the mortgage to the Farmers' Loan and Trust Company) was laid with the rails furnished under the first two of the above contracts, but it was not shown what proportion of those rails were furnished under each of the contracts; 30.8 miles of the railway were laid with rails furnished under the third contract. The old iron rails removed from the 37 miles of the Waco Division, upon which the above rails were laid — 2960 tons — were received by the receivers in cause No. 185, and were sold by them in 1885 at the price of $13 net.

The master's report contained the following:

"I find that the debt for which the Lackawanna Company claims payment in its petition herein cannot be classed as a current debt made in the ordinary course of business, as those terms seem generally to be understood, yet it appears that at the time when the contracts hereinbefore mentioned were entered into between said Lackawanna Company and the defendant Railway Company that the condition of the track of the defendant Railway Company was such that the demand for new rails upon the most worn portion of the roadway was practically imperative. For a number of years prior to December, 1882, only about 5000 tons of new rails had been purchased. The road north from Houston for 90 miles was built in 1857–1861, and thence northward to Denison, 1867–1872. The Western Division leading to Austin was constructed in part prior to 1861, and completed in 1873, and the Waco Division was completed about 1875. The condition of these roads was bad, except such portions as had been relaid with 5000 tons of rails purchased prior to December 28, 1882. There was continual breakage of rails and wrecking of trains, the track was unsafe, and was generally so regarded, not only by 'railroad men,' but by the travelling public; the damage to merchandise, rolling stock, etc., was continuous, and the need for new rails appears to have been 'absolutely necessary as a preservation of human life. the loss of which was liable to occur at any moment.'

"I find that when the aforesaid contracts were made with the said Lackawanna Company both seller and buyer expected the debts to be paid from the net income of the railway; that the credit extended under said contracts was at the request of and for the accommodation of the defendant Railway Company and upon its general credit. That said sales were made without any stipulation that security should be given by the defendant company for said rails, or that payment therefor should be made out of any particular fund or in any particular way; that said sales were for an unusually large amount of rails, and the defendant was unable to pay cash therefor, and there was no other way of obtaining said rails except upon

credit ; and petitioner herein at the time of said contracts and sales had knowledge of the mortgage of June 16, 1873, given by the defendant Railway Company upon the properties of its Waco and Northwestern Division to secure the first mortgage bonds, which said mortgage has been herein foreclosed. I find that the steel rails supplied by said Lackawanna Company under the aforementioned contracts, 18,581 tons, were placed in the track of the defendant Railway Company as soon as received."

The bonded debt of the Railway Company on January 1, 1885, was $16,874,500. The interest on all classes of its bonds payable in 1894, amounting to $1,194,200, was paid as it matured. The Railway Company first made default in the payment of interest on its bonds January 1, 1895, on which day the interest on first mortgage bonds became payable.

The Southern Development Company, a California corporation, on the 16th day of February, 1885, instituted suit against the Houston and Texas Central Railway Company, asserting a claim against it for about $600,000 for money loaned at various times. This was cause No. 185. It set forth in its bill the embarrassed condition of the Railway Company, the danger of its property being scattered, wasted and lost, and asked that the Company's property be put in the hands of receivers, and a decree passed directing that out of the rents, revenues, issues and profits coming into the hands of the receivers, after payment of costs of administration, operating and other necessary expenses, the claims of the plaintiff, the Southern Development Company, with interest and costs be paid. On the motion of that Company, Clarke and Dillingham were appointed receivers of the property. They immediately qualified as receivers and took possession of the property. An amended and supplemental bill was filed making Easton, Rintoul and the Farmers' Loan and Trust Company defendants as trustees of the various mortgages upon the Railway Company's property. Clarke and Dillingham continued to act as receivers until about July 10, 1886, when they delivered possession of the property and the revenues in their hands to Easton, Rintoul and Dillingham who had previously

been appointed joint receivers of the Railway Company under bills filed by the trustees of certain mortgages on the main line and Western Division, and also by the Farmers' Loan and Trust Company as trustee in the general mortgage of the Houston and Texas Central Railway Company. The last-named litigation was known as cause No. 198.

In cause No. 185 the Lackawanna Company intervened by petition, and asked to be made a coplaintiff. It prayed that an account be taken of its several demands, that the amount thereof with interest be paid out of the net revenues of the Railway Company, and be declared a lien thereon and upon all the property of the Company superior in rank to the claims of the trustees and to the mortgage bonds and coupons issued under their various deeds of trust.

To the bill of the Southern Development Company, Easton and Rintoul, trustees, demurred generally and specially. The demurrer was sustained, and the bill and supplemental bill were dismissed with costs on the 27th day of May, 1886, but without prejudice to the rights of the complainants to assert their claims, if any they had, in such manner as they were advised. By the same decree Clarke and Dillingham were discharged and ordered to turn over all the property and effects of the Railway Company together with its accrued revenues in their possession to Easton, Rintoul and Dillingham, who had then been appointed joint receivers of the Railway Company under an order made in the "Consolidated Cause No. 198," *Easton and Rintoul, Trustees, and the Farmers' Loan and Trust Co. v. Houston and Texas Central Co. et al.* — the constituent suits of such consolidated cause being causes Nos. 198, 199 and 201, which were bills of foreclosure against various parts of the railway.

The three mortgages declared on in causes 198, 199 and 201 were duly foreclosed by final decree entered in the consolidated cause on the 4th day of May, 1888, and on September 8, 1888, all the property of the Railway Company was sold under that decree, George E. Downs becoming the purchaser of the Waco and Northwestern Division, subject, however, to the particular mortgage sought in this suit to be foreclosed,

namely, the mortgage of June 16, 1873, known as the Waco Division first mortgage, the Farmers' Loan and Trust Company being the trustee therein. The sale was also made subject to the right which the court reserved by the decree (to use the words of the master in his report) to charge upon the property or any part thereof the payment of any amount that might be found to be due and payable by reason of intervening petitions theretofore filed in that cause and be entitled to priority over the mortgage debts referred to in the decree.

From February 20, 1885, to the date of the report, the property of the Railway Company, forming the subject-matter of the receivership in this cause, was continuously in the possession of the court under proceedings in suit No. 185, and thereafter in suits Nos. 198 and 227.

The master found and reported that no interest had been paid on the bonded indebtedness by either of the receivers in this cause; that Alfred Abeel, receiver in this cause, had expended under the orders of the court $46,505.40 for betterments and permanent improvements from December 10, 1892, to September 3, 1895, consisting of bridges, shops, roundhouse, car shed, water stations, locomotives, chair car and fencing; that no part of the income arising from the operation of the road and no part of the proceeds of sales of old rails, old iron, old cars and engines, coming into the possession of the receivers in causes 185 and 198, ever came into the possession of the receivers in this cause, and it did not appear that any part of the equipments purchased by the receivers in causes 185 and 198 ever came into the possession of the receivers in this cause; that the evidence failed to show that any improvements and betterments of the property, added to the property of the Houston and Texas Central Railway Company by the receivers in causes 185 and 198, were made *on the Waco Division;* that prior to April 6, 1889, no separate accounts were kept of the receipts and disbursements of the Waco Division, but the same was operated as a branch of the general system of the Houston and Texas Central Railway Company, and the evidence failed to show what, if any, of the expenditures made by the receivers in causes 185 and 198 for extraor-

dinary repairs, betterments and improvements, and for operating and running expenses, were made for the Waco Division and what portions for other divisions of the Houston and Texas Central Railway Company, and this was true also as to receipts and income; that the receivers in cause 185 had on hand in cash at the opening of business on January 21, 1886, $175,393.65, but it did not appear that any part of that fund came to the hands of the receivers in this cause; and that the receiver in cause 198 had on hand at the beginning of business on April 6, 1889, cash amounting to $215,842.45, but it did not appear that any part of that sum came to the hands of the receivers in this cause.

The mortgage given by the Railway Company to the Farmers' Loan and Trust Company, dated June 16, 1873, and herein declared on, contained the following provisions:

" And in case the said Houston and Texas Central Railway Company shall fail to pay the principal, or any part thereof, or any instalment of the interest, or any part thereof, on any of the said bonds at any time when the same shall become due and payable according to the tenor thereof, and for sixty days after having been demanded, it shall be competent for the said trustee, its successors or assigns, to enter upon the said railway and the premises and property herein conveyed, by its attorneys and agents, and take possession of the same without let or hindrance of the said first party, and every part and parcel thereof, and the appurtenances, and appoint an agent to operate and manage the same, and receive the revenue and income thereof, applying the said funds, after deducting taxes, necessary expenses and counsel fees, to keep the same in good order and repair, and the surplus to pay the principal and interest of all the bonds which may be due and outstanding, and secured hereby *pro rata*, and thereafter, to the payment of any contributions due to the sinking fund herein established. And upon the request of the holders of one fifth in amount of the bonds so in default which may be at any time outstanding under this deed of trust, it shall be the duty of said second party, by its president or agent duly appointed in its behalf, to enter upon and take actual possession with or without entry

or foreclosure of said railway and property herein described, and all and singular each and every part and parcel thereof, and assume its management until the arrears of both principal and interest be paid, or the property sold, as herein prescribed, receiving the rents, revenues and income thereof, and applying them in the same manner as above stated. It is, however, expressly agreed that the said party of the first part may dispose of the current net revenues and income of all the said property and railway hereby conveyed in such manner as it shall deem best, until default shall be made in the payment of the interest or principal of said bonds, or of any one or more of them, and shall have the right to sell and dispose of any of such real estate or other property as it may own or acquire, which may not be needed or required for the purposes and business of the said Waco and Northwestern Division, except in the case of the six thousand acres per mile of completed road, and which sale and conveyance of such outside property shall transfer the said property and title free from incumbrance of this mortgage or deed of trust, and to change its tracks and make any and all alterations necessary for the benefit of the same."

That mortgage contained no provision authorizing the trustee, if it acquired possession of the railway under that instrument, to pay any floating debt or debts of the mortgagor company out of the gross earnings of the railway.

During the receivership of Clarke and Dillingham, in cause 185, they received revenues from the operation of the railway, from February 23, 1885, to January 21, 1886, $2,758,487.40, and paid out for operating expenses, taxes, etc., for the same period, $2,137,322.44, leaving a surplus of $621,164.96. From January 21 to July 10, 1886, they received $1,143,731.05, and paid out for operating expenses during the same period $1,341,753.85, leaving a deficit for that period of $198,022.80, but leaving a net balance from the operation of the railway from February 23, 1885, to July 10, 1886, of $423,142.16. When Clarke and Dillingham took possession of the property of the Railway Company on February 23, 1885, they received in cash $30,416.34, while they collected for traffic balances

and other claims $118,730.08, from sales of old rails on hand. February 23, 1885, $110,275, and from sales of old cars $6500, making a total of $265,921.42.

Clarke and Dillingham during the time they were in possession of the property as receivers, and Easton, Rintoul and Dillingham while they were in possession as receivers, expended under the orders of court the following sums outside of operating expenses: $23,274.20 for liabilities of the Railway Company; $751,438.15, interest on first mortgage bonds of the Company due January 1 to July 1, 1885; $245,793.64 for new steel rails; $125,695.44 for car trust notes; $265,696.33 for new passenger coaches, baggage, mail and express cars, locomotives, etc.; and $126,218.62 for right of way, fencing track, real estate, depot, round-house, foundry and pattern-house; in all, $1,536,116.38, of which $384,026.20 was expended under the receivership of Clarke and Dillingham. These were the receipts and expenditures up to January 9, 1888, and there was no evidence as to receipts and expenditures after that date.

Easton, Rintoul and Dillingham during their receivership realized out of proceeds of sale or collection of old assets of the defendant company the sum of $135,889.70.

The receivers in cause 198 received from the receivers in cause 185 the sum of $138,751.37 in cash.

The receivers in the consolidated cause 198, after taking possession on July 10, 1886, paid liabilities of the receivers, Clarke and Dillingham, taxes, outstanding vouchers, pay rolls, traffic balances, $221,421.32, and collected from the amount due Clarke and Dillingham as receivers in cause 185 the sum of $39,016.69.

On the 26th day of November, 1886, the Lackawanna Company filed its petition of intervention in cause 198, praying substantially for the same relief against all the railways, revenues, earnings, moneys and other properties and assets of the defendant company, including those forming the subject-matter of the receivership herein, as was prayed for by its petition of intervention in this cause. Upon that petition the master reported in that cause that under the facts the

debt for which the company filed its petition was of a character equitably entitling it to be discharged in preference to the mortgage represented in that suit, but which preference should be applicable to so much only of the company's debt as should remain unsatisfied after exhausting the 170 first mortgage five per cent bonds of the Galveston, Harrisburg and San Antonio Railway (Mexican & Pacific extension) of the face value of $170,000, and which, as heretofore stated, were pledged as security. The Farmers' Loan and Trust Company filed exceptions in that cause to the master's report, but at the date of the master's report in this cause the exceptions had not been brought to a hearing.

The Lackawanna Company on the 30th day of April, 1889, filed suit upon its claims against the Houston and Texas Central Railway Company in the District Court of Dallas County, Texas, a court of competent jurisdiction, and in that suit, after due citation, judgment was rendered against the railway company May 19, 1899, for $555,914.25 with interest. Upon that judgment execution was issued and was returned August 20, 1899, no property found subject to execution.

Of the interest paid by the receivers on the first mortgage bonds of the defendant railway company, $79,800 consisted of coupons upon the first mortgage bonds of the company secured by mortgage upon the Waco Division, being the property forming the subject-matter of the litigation herein. Interest was paid upon the coupons representing the same, maturing January 1 and July 1, 1885, to the amount of $11,571, making a total amount of interest paid to holders of bonds secured by mortgage on the Waco Division of $91,371, paid May 1, 1887.

During the years 1883 and 1884 the defendant company paid $2,386,400 interest upon its bonds, which amount, less $1,043,198.27, borrowed for interest purposes in those years, was presumably (the contrary not appearing) paid from its income or current earnings, and out of said total the sum of $159,600 was paid as interest upon the first mortgage bonds of the Waco Division, the bonds which are the subject-matter of the bill of complaint in this cause. During 1883 and 1884

$2,225,000 approximately were expended from the earnings and general income of the defendant company's property in the payment of interest on bonds and in additional equipments, permanent improvements, etc.

The accounts of the railway company were not kept in such manner as to indicate the exact fund out of which the interest on the first mortgage bonds of the Waco Division was paid, or the exact fund out of which the interest upon the bonds of the other divisions was paid; and no separate account was kept of the earnings of that division as distinguished from the net earnings of the other divisions of the railway company, either prior to or during the receivership thereof, until about April 20, 1889. During the receivership in cause 198, the receivers expended in the payment of interest upon the bonds forming the subject-matter of the bill of foreclosure herein the sum of $91,371.

By a final decree rendered March 16, 1892, the Circuit Court made in this cause a decree of foreclosure and sale in behalf of the Farmers' Loan and Trust Company. The decree contained these among other provisions:

" And the purchaser or purchasers of said property at said sale shall, as a part of the consideration of the purchase, and in addition to the sum bid, take the property upon the express condition that he or they will pay off, satisfy and discharge any and all claims and interventions now pending and undetermined in this court, accruing prior to the appointment of the receiver herein or during the receivership, which may be allowed and adjudged by this court as prior in right to complainant's mortgage, together with such interest as may be allowed ; and also upon the further express conditions that he or they will pay off, satisfy and discharge all debts, claims and demands of whatsoever nature incurred or which may hereafter be incurred by said receiver Charles Dillingham, and which have not been or shall not hereafter be paid by said receiver or other parties in interest herein; and said purchaser or purchasers, their successor or successors, or assigns, shall also have the right to appear and make defence to any claim, debt or demand sought to be enforced against

said property; and said purchaser or purchasers, their successor or successors, or assigns, shall also have the right to appear and make defence to any claim, debt or demand pending and undetermined at the date of the confirmation of such sale. . . .

"And it is further ordered, adjudged and decreed that it be recited in the deed to be executed and delivered to said purchaser or purchasers, that he or they do take said property, subject to, and that said purchaser or purchasers do assume and agree to pay off any and all debts, claims and demands of whatsoever nature now pending and undetermined, and which may be allowed and adjudged by this court, as prior to any right secured under complainant's mortgage, and subject likewise to all debts, claims and demands of whatsoever nature incurred by Charles Dillingham as receiver in this cause, and which may remain unpaid at the termination of said Dillingham's receivership, provided the same be presented, as hereinbefore provided, within six months after the confirmation of said sale. It is further ordered, adjudged and decreed that the rights of the Lackawanna Coal and Iron Company, the Southern Development Company, the Pacific Improvement Company and the Morgan's Louisiana and Texas Railroad and Steamship Company, intervenors herein, and the rights of all other intervenors herein, be and they are hereby reserved to be hereinafter adjudicated, and are in no manner affected or prejudiced by this decree. It is further ordered that the disposition of any surplus funds arising from the earnings of the road, or otherwise, that may be in the hands of the receiver, is reserved for future determination."

Subsequently, February 26, 1896, a decree was passed in this cause dismissing the intervention herein by the Lackawanna Iron and Coal Company and the Pacific Improvement Company, but without prejudice to the rights of those companies under or by virtue of the intervention in equity cause 198.

This order was affirmed in the Circuit Court of Appeals. 52 U. S. App. 91. The case is now here on certiorari for reëxamination.

*Mr. Maxwell Evarts* and *Mr. E. B. Kruttschnitt* for the Lackawanna Iron and Coal Company, appellant.

*Mr. Herbert B. Turner* for the Farmers' Loan and Trust Company, appellee.    *Mr. M. F. Mott* was on his brief.

*Mr. L. W. Campbell* for Moran Bros. and Henry K. McHarg, appellees.

MR. JUSTICE HARLAN, after stating the above facts, delivered the opinion of the court.

In *Southern Railway Co.* v. *Carnegie Steel Co., ante*, 257, just decided, we had occasion to consider in the light of our previous decisions the principal questions arising in the present case. We need not repeat here what was said in the opinion in that case as to the general principles applicable in cases involving the respective rights of mortgage creditors and of unsecured creditors in the earnings of an insolvent railroad corporation in the hands of a receiver.

The above statement of the history of this litigation shows that the Houston and Texas Central Railway Company had three contracts with the Lackawanna Company for steel rails; that those contracts were made, respectively, on December 28, 1882, April 26, 1883, and October 30, 1883; and that all the rails delivered under the first contract, and about one half of those delivered under the second contract, were paid for, leaving unpaid for one half of the rails delivered under the second contract and all delivered under the third contract. But the claim for the balance due for rails covered by the contract of April 26, 1883, is abandoned because, as stated by counsel for the Lackawanna Company, it is impossible to state with certainty how many of the rails delivered under that contract were actually used on the Waco Division. We are therefore only concerned in this case with the contract of October 30, 1883, under which rails were delivered.

It also appears that in suit No. 185, brought by the Southern Development Company in February, 1885, receivers were

appointed of the entire property of the Houston and Texas Central Railway Company, including the Waco Division; that that suit was dismissed in May, 1886, and shortly before that time suits were brought by the trustees of the mortgages on the main line and on the Western Division of that company for the foreclosure of those mortgages, receivers were appointed and the suits were consolidated as Consolidated Case 198; that in the latter cause the entire property was sold September 8, 1888, subject, however, to the first mortgage on the Waco Division; and that the Waco Division was separately sold subject to the first mortgage thereon.

Subsequently, September 6, 1889, the present suit was brought to foreclose the first mortgage on the Waco Division. The Lackawanna Company intervened herein by petition, asking that an account be taken of the amounts due to it, and for a decree "declaring that the sums so due are liens upon the net earnings of said Railway Company, and especially upon those portions of said net earnings which have accrued or may accrue from the railways described in the bill of complaint in this cause, both those accrued prior to said receivership in said cause No. 185, and those accrued and to accrue during the receivership in said cause No. 198, extended to this cause, and upon all of the property of said railway company, superior in rank to the claims of said trustee and of the mortgage bonds and coupons issued under the deed of trust sought to be foreclosed in this cause;" and "that the net earnings of the railway described in the bill of complaint in this cause in the hands of said receiver, accrued or to accrue, be first devoted to the payment of the accounts so decreed, and if they be not sufficient prior to the final decree in this cause to pay said amounts, then that your honors do decree the payment of said amounts out of any proceeds of sale of the property of said Railway Company to be made under said final decree, the amounts so decreed to your petitioner to be paid in preference to any amount due under the mortgage bonds and coupons issued under the deed of trust annexed to the bill of complaint in this cause."

The principal ground upon which the Lackawanna Com-

pany bases its claim for the relief asked is that when each of the above contracts were made the Waco Division was in such condition that new rails were imperatively required in order that the road might be safely used for the transportation of persons and property. Such, it may be assumed, was the condition of the road when the rails were contracted for and delivered, for it was so found by the master to whom the intervening petition of the Lackawanna Company was referred with direction to take the account prayed for and to report the facts, and to that report no exceptions were filed. But the necessary inference from the report in connection with the averments of the intervening petition is, that the work required to be done in order to put the main road of the Houston and Texas Central Railway Company and its divisions in proper condition was not such as would be done in the ordinary course of the business and operations of a railroad, but was so extensive as to amount to reconstruction, or the construction of new road. That was the view expressed by the Circuit Court of Appeals, and it explains what the master meant by the finding that the debt for which the Lackawanna Company claimed payment could not be classed as a " current debt made in the ordinary course of business." This court has uniformly held that in the distribution of the current earnings of an insolvent railroad company, whose property is being administered by a receiver, mortgage creditors could not be postponed to unsecured creditors, unless the debts due the latter were of the class known as current debts arising in the ordinary course of business and properly chargeable upon current receipts. The decision in each case has been more or less controlled by its special facts. But we are of opinion that such expenditures as those incurred in the making of the contracts with the Lackawanna Company were not such as are made in the ordinary course of the operations of a railroad, and cannot be deemed current debts within the rule that a railroad mortgagee when accepting his security impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business, in order to keep it a going concern, shall be paid out of current receipts before he has any claim upon

such income. *Southern Railway Co.* v. *Carnegie Steel Co.*, *ante*, 257, and authorities there cited. They are rather to be regarded as extraordinary expenditures, outside of the ordinary course of business and incurred for purposes not of repair but of construction. This court has said that it is the exception, not the rule, that the priority of mortgage liens can be displaced. *Kneeland* v. *American Loan & Trust Co.*, 136 U. S. 89, 98; *Thomas* v. *Western Car Co.*, 149 U. S. 95, 111. We have said that priority of unsecured claims is recognized only in a few specified cases in which equity and good conscience require that the vested liens of mortgage creditors shall be postponed in the application of current earnings to current debts. Sound principle forbids that a court of equity should imply an agreement upon the part of mortgage creditors to subordinate their claims to such debts as those due to the Lackawanna Company. To so hold would place their rights at the mercy of the railroad company having charge of the property upon which their recorded liens rest. Besides, the rails in question were delivered long before the railroad company had made any default in the payment of interest; about sixteen months before the company's property was put into the hands of a receiver, and about five and a half years before the appointment of a receiver in this cause. Then there is the circumstance that the Lackawanna Company, during the negotiations resulting in the execution of renewal notes under the second contract for rails, demanded and received collateral security to a large amount from the railroad company — a circumstance tending to show that it did not regard itself as entitled to an equitable claim upon net earnings in preference to mortgage creditors, but relied upon the general credit of the railroad company. However meritorious the claim of the Lackawanna Company may be as between it and the railroad company, we cannot by reason of anything appearing in the record impair or displace the liens of mortgage creditors for its benefit. Under all the circumstances, including the amount of the debt and the long period of credit, the claims in question must be regarded as general unsecured debts, not contracted in the ordinary course of business, and

with the expectation of the parties that they were to be met out of current receipts in preference to claims of mortgage creditors. It is not therefore entitled to the priority claimed. The view taken of the case by the Circuit Court of Appeals is indicated by Judge Parlange, whose opinion, on behalf of that court, thus concludes: "The unusually large purchase of rails, the time within which they were to be delivered, the condition of the road, the contracts providing for notes at six months renewable for a like term at the maker's option, the hypothecation of securities for the payment of the claim, the knowledge which the intervenor had of the mortgage, the fact that the contracts contained no promise to pay out of any particular fund, the time which elapsed between the date of the contracts and the appointment of a receiver in cause No. 185 — are circumstances which, taken together, cannot fail to convince us that the intervenor relied upon the general credit of the railway company."

The decree of the Circuit Court of Appeals is therefore

*Affirmed.*