634 F.2d 1359
 In re BOSTON AND MAINE CORPORATION, Debtor,
Appeal of CHESAPEAKE AND OHIO RAILWAY COMPANY et al.,
In re BOSTON AND MAINE CORPORATION, Debtor,
Appeal of MAINE CENTRAL RAILROAD COMPANY et al.,
In re BOSTON AND MAINE CORPORATION, Debtor,
Appeal of PENN CENTRAL CORPORATION,
In re BOSTON AND MAINE CORPORATION, Debtor,
Appeal of CANADIAN PACIFIC,
In re BOSTON AND MAINE CORPORATION, Debtor,
Appeal of EASTERN ASSOCIATED COAL CORPORATION.
 Nos. 79-1230, 79-1231, and 79-1234 to 79-1236.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 14, 1980.
Decided Oct. 6, 1980.
 
 1
 John T. Collins, Boston, Mass., with whom Sherburne, Powers & Needham, Boston, Mass., was on brief, for Chesapeake and Ohio Railway Company, Baltimore and Ohio Railway Company and Western Maryland Railway, appellants.
 
 
 2
 Paul B. Galvani, Boston, Mass., with whom Reed Witherby and Ropes & Gray, Boston, Mass., were on brief, for Maine Central Railroad Company and Portland Terminal Company, appellants.
 
 
 3
 George W. McLaughlin, Boston, Mass., for Canadian Pacific, appellant.
 
 
 4
 Philip Burling, Boston, Mass., with whom Peter A. Fine and Foley, Hoag & Eliot, Boston, Mass., were on brief, for Eastern Associated Coal Corporation, appellant.
 
 
 5
 Robert M. Gargill, Boston, Mass., with whom Zdislaw W. Wieckowski, Choate, Hall & Stewart, and Charles W. Mulcahy, Boston, Mass., were on brief, for Trustees of the Boston and Maine Corporation, Debtor, appellees.
 
 
 6
 Joseph H. B. Edward, Boston, Mass., with whom Bingham, Dana & Gould, Boston, Mass., was on brief, for First National Bank of Boston and Malcolm W. Hall, Successor Trustees, under First Mortgage Indenture Dated December 1, 1919 of Boston and Maine Corporation, appellees.
 
 
 7
 Before KUNZIG,* Judge, U.S. Court of Claims, BOWNES, Circuit Judge, DOOLING,** Senior District Judge.
 
 
 8
 DOOLING, District Judge.
 
 
 9
 The present appeals[1] in this railroad reorganization case challenge the district court's order, 468 F.Supp. 996 (D.Mass.1979), determining the priorities of the creditors and stockholders in the reorganization of the Boston and Maine Corporation. Railroads which, as required by the Interstate Commerce Act and the cases decided under it, have interlined freight cars with the Boston & Maine appeal from the district court's refusal to accord their claims for per diem charges for cars furnished in the periods August 1, 1953, to July 31, 1969, and August 1, 1969, to March 12, 1970, such a priority in the classification of creditors as would assure full payment of the claims. The interlining railroads and Eastern Associated Coal Corporation appeal also from the district court's refusal to establish a separate class of creditors, to be accorded priority as "six months creditors," for the railroads' claims for per diem car hire, car repair, loss and damage, and freight overcharges for the six months preceding the filing of the involuntary petition against the Boston and Maine on March 12, 1970, and for the Coal Corporation's claim for diesel fuel furnished in the same six months period.
 
 
 10
 * The railroads' per diem claims, aggregating $8,582,000, are described in Chief Judge Coffin's opinion for this court, 600 F.2d 307 (1st Cir. 1979), affirming the district court's refusal, 456 F.Supp. 412 (D.Mass.1978), to order immediate payment of the per diem charges before payment of all other unsecured pre-reorganization claims.[2] On that appeal this court rejected the contention that because the trustees' operation of the Boston and Maine is subject to the jurisdiction of the Interstate Commerce Commission, see former Bankruptcy Act § 77(c)(2), 11 U.S.C. § 205(c)(2) (1976), and because the ICC has ordered payment of specific per diem rates at specific settlement times, neither the trustees nor the court have discretion to defer payment of the pre-petition per diem charges. 600 F.2d at 308. This court concluded that the ICC had not exercised its statutory power, 49 U.S.C. § 1(14)(a) (1976), to fix the rates for per diem settlements for the period August 1, 1953, to August 1, 1969, and that, so far as concerned the period after August 1, 1969, following the ICC's entry of a per diem rate order, the general power of the ICC to supervise the trustees' operation of the railroad did not outweigh the fundamental power of the reorganization court to set priorities for payment of pre-reorganization claims, Bankruptcy Act §§ 77(b), (c)(7), (l ), and to schedule payment of such claims consistent with the need to conserve assets for rehabilitation of the debtor. 600 F.2d at 309-10. The court added that the 1968 ICC order that interlining railroads pay specific per diem charges, Chicago, B. & Q. R. R. v. New York, S. & W. R. R., 332 I.C.C. 176, 241, 333 (1968), was an order of general application, and that, since non-payment of the per diem claims violated no specific order directed to the reorganization trustees, the remedial provisions of Section 1(17)(a) of the Interstate Commerce Act[3] could not be invoked. 600 F.2d at 312. The court observed that, fundamentally, the specific duty to pay the per diem charges due for the pre-reorganization period had been a duty of the railroad, and, after the filing of the petition, those charges became claims against the debtor, not claims against the trustees; the specific duty of the trustees, as operators of the railroad, to pay per diems was limited to the per diems incurred by the trustees in their operation of the road.[4] The court rejected the contrary reasoning of In re Chicago, R. I. & P. R. R., 537 F.2d 906 (7th Cir. 1976), cert. denied, 429 U.S. 1092, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1977), and indicated agreement with the result reached in In re Penn Central Transportation Co., 486 F.2d 519 (3rd Cir. 1973), cert. denied, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974), and which the Third Circuit reaffirmed in the different circumstances of In re Penn Central Transportation Co., 553 F.2d 12 (3rd Cir. 1977). See 600 F.2d at 310-12.
 
 
 11
 On this appeal the interlining railroads argue, first, that since the interlining of freight cars is mandatory under the Interstate Commerce Act, 49 U.S.C. §§ 1(4), (10), (11), (14), (15), and (17), equity and considerations of national transportation policy unite to require that the roads receive just and reasonable compensation for the compelled loan of freight cars; it is argued that the rail car fleet cannot be maintained at the level essential to adequate rail service unless payment of car hire is assured even in the case of the railroads that are in reorganization. The argument is essentially that made on the earlier appeal, and, so far as concerns the per diem claims for the period 1953 to August 1, 1969, is disposed of by what was then decided: the per diem claims for that sixteen year period were not based on an ICC order fixing rates and ordering payment at those rates; the ICC in Chicago, B. & Q. R. R. v. New York, S. & W. R. R., 332 I.C.C. 176, 183, 244-57 (1968),[5] did, indeed, make findings as to the reasonableness of the rates charged for the preceding fifteen years, but those findings, it stated, were "of significance only as an aid to the courts in settling the amount of damages in the pending lawsuits" (id. at 183).[6]
 
 
 12
 The unpaid per diem charges for car use during the period August 1, 1969, to March 12, 1970, the date on which the reorganization proceeding commenced, aggregated $564,000; they were imposed at the rate determined by the order of the ICC, Chicago, B. & Q. R. R. v. New York, S. & W. R. R., supra, 332 I.C.C. at 259; that order became final upon the Supreme Court's affirmance of the district court decisions dismissing the railroads' actions to set the order aside,[7] and it was made effective August 1, 1969. This court's decision on the earlier appeal is dispositive of all the contentions raised on the present appeal as to this portion of the per diem claims except the constitutional argument. While Chief Judge Coffin's opinion was occasioned by the "immediate payment" contention of the railroads, it dealt directly and necessarily with the underlying issues of statutory interpretation and with the contention that a priority in reorganization for per diem claims would, by furnishing to the railroads an incentive for overcoming the chronic shortage of freight cars, better serve the interest of national transportation policy than would denying the priority in the interest of preserving the public service viability of bankrupt roads.
 
 
 13
 The railroads argue, on the constitutional issue, that since Congress has mandated the interline loan of cars and the ICC has fixed the per diem rates to be paid for the cars lent, denying to the car-owning railroads such a priority as will assure payment of the per diem claims in reorganization effects a taking of their property without due process of law, an unconstitutional taking akin to that found in Chicago, R. I., & P. Ry. v. United States, 284 U.S. 80, 96-100, 52 S.Ct. 87, 92-93, 76 L.Ed. 177 (1931); there a divided court invalidated that part of the ICC order in Rules for Car-hire Settlement, 160 I.C.C. 369, 386-395, 445 (1930), that granted to the short line railroads two days of free time for interchanged loaded cars and denied compensation altogether in the case of cars received for return loading with coal from mines customarily dependent upon connecting carriers for car supply. The Court put the decision on the ground that, since the ICC had found that the owning roads were entitled to receive reasonable compensation in the form of a daily rental for the use of their general-service freight cars when on foreign lines, and that the $1 per car day charge then in effect was such reasonable compensation, the ICC could not, without inconsistency, relieve one class of railroads of the duty to pay that reasonable compensation: "The use of railroad property is subject to public regulation, but a regulation which is so arbitrary and unreasonable as to become an infringement upon the right of ownership constitutes a violation of the due process of law clause of the Fifth Amendment." 284 U.S. at 97, 52 S.Ct. at 92.[8]
 
 
 14
 The rule, thus condemned by its very terms, effected at least a partial denial of compensation for car use in every instance of an interchange of cars between trunk line and short line. However, the failure to accord a special priority in reorganization to per diem claims neither denies an entitlement nor takes either property or its use without compensation. It is rather a refusal, on a ground of statutory policy, to confer on per diem charges the special advantage of freedom from one commercial risk, the risk of becoming an unsecured claim in reorganization. Whatever might be the case if interchange of cars was enforced in circumstances in which there was certainty of non-payment, it is not the case that a scheme of regulation that effects an appropriate public purpose may not, without violation of constitutional principle, entail random losses due to extrinsic factors. See Baltimore & O. R. R. v. United States, 345 U.S. 146, 148, 73 S.Ct. 592, 593, 97 L.Ed. 912 (1953) (carload rates on certain kinds of fresh vegetables not violative of due process merely because they are noncompensatory; so long as regulations do not cause railroad to lose money on its overall business "it is hard to think that it could successfully charge that its property was being taken for public use without just compensation");[9] Indiana Harbor Belt R. R. v. United States, 510 F.2d 644, 650 (7th Cir.) (ICC order requiring belt line to move empty cars to repair shops without charge not an unconstitutional taking of property without just compensation absent a showing as to belt line's overall operations), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); Western Air Lines, Inc. v. CAB, 495 F.2d 145, 152-153 (D.C.Cir.1974) (Board's denial of operating certificate to carrier that sought to operate only over profitable routes justified by consideration that supra-competitive profits of a single carrier already serving the route would enable it to undertake unprofitable local service that required such subsidization).
 
 
 15
 The railroads' contention must be considered strictly in terms of the necessary impact of the rules for car-hire settlement in the case of per diem claims against railroads in reorganization. But no extension of credit to insolvent railroads is inherent in the rules for car-hire settlement; the Commission in Rules for Car-hire Settlement, supra,[10] approved the rule of the "car service and per diem agreement" among the subscribing railroads which required that the car owner be furnished with a per diem statement within forty days after the end of each calendar month giving the number of days each car has been in the possession of the reporting road; the Commission noted that customarily the car owner, upon receipt of that information, drew on the using line for the amount reported after deducting per diems, if any, owed the other carrier. The accumulation of charges beyond the forty days was the product of the interminable controversy over rates, not a necessary consequence of interlining freight cars; the modest credit term implicit in the car-hire settlement rules could hardly be much shortened, and, given the importance of interchanging cars to the owning railroads' earning of freight revenue, the credit risk involved is not different from that generally incident to the conduct of industrial and commercial business. That some per diems of such short date may go unpaid in some railroad reorganizations, and that the loan of cars is required by law, do not combine to show a taking without just compensation. What must be shown to demonstrate unconstitutionality, and is not shown, is that the regulatory scheme as a whole, not excluding the incidence of the loss in reorganization cases arising from the extensions of credit required by the settlement rules, operates to take the property of the car-owning roads without just compensation, or is so unreasonable or arbitrary that it violates due process. The interline car-service rules and practices have evolved pragmatically in reasoned stages with but one only partly successful constitutional challenge (Chicago, R. I. & P. Ry. v. United States, supra) from the beginning position that a railroad could refuse to send its cars beyond its line when there was a car shortage since its first duty was to the business of its line, Riddle, Dean & Co. v. Pittsburgh & Lake Erie R. R., 1 I.C.C. 374, 388 (1888); through the critical decision that local traffic does not enjoy rights superior to through traffic and that carriers must make reasonable rules and regulations with respect to the operation of through routes and the exchange, interchange and return of cars used on these routes, Missouri & Illinois Coal Co. v. Illinois Central R. R., 22 I.C.C. 39, 48-49 (1911); to the later comprehensive ICC review and implementation of general car service standards in Rules for Car-hire Settlement, supra, and the succession of ICC orders of more recent years. In Chicago, B. & Q. R. R. v. New York, S. & W. R. R., 332 I.C.C. 176 (1968),[11] the Commission, accepting the concept that car hire should be enough reasonably to compensate the owner for its costs of ownership and no more,[12] concluded that per diem charges should constitute no more than a sharing of cost, and should not include any amount for the value of the use of a car. Id. at 186-87.[13]
 
 
 16
 Bad debt losses of the car-owning railroads in rail reorganizations are simply elements of cost incident to the massive system of interchanging freight cars, and unless the system as a whole is shown to burden the car-owning railroads unreasonably or arbitrarily or to deny them overall reasonable compensation for the mandated loan of their cars, there is no transgression of constitutional right. No such showing was attempted, nor is it suggested that it could be made.
 
 II
 
 17
 The claims for which priority is asserted under the "Six Months Rule" do not exceed $3,000,000 and include per diems for the period commencing September 13, 1969; priority is also claimed for the greater part of the same claims under the "Necessity of Payment" rule, but for some $400,000 of claims priority is sought under the Necessity of Payment rule only. The district court held that to establish a priority under the Six Months Rule the creditor had to show that its claim was for a necessarily incurred current operating expense of the railroad, that it accrued within the six months preceding the filing of the reorganization petition, and that the goods or services were furnished in the expectation of payment from current railway operating revenues and not in reliance on the railroad's general credit. 468 F.Supp. at 1002. The court held further that the creditor had to show that there existed a fund in which qualifying six months claims would have a priority, that is, a "current debt (or expense) fund" comprised of current earnings of the six months period and during the reorganization or, absent a surplus of such earnings, corpus of the reorganization estate to the extent that such earnings have been diverted to it for the benefit of the railroad's mortgagees.[14] Id. at 1002-1005. The court concluded from the evidence that, treating depreciation as properly deductible in determining the amount of surplus earnings available for a "current debt fund," no surplus revenues had accrued either in the six months preceding the filing of the reorganization petition or during the reorganization proceeding; that, in addition, contributions to railway operating income and to the reduction of railway operating expenses had been made from the proceeds of sales of mortgaged property and from sales of scrap derived from mortgaged property; and that, finally, even if the net railway operating deficit for the relevant period, $42.5 million, were reduced by disallowing capital expenditures for property and improvements of $12.9 million, payments of pre-reorganization secured obligations of $5.6 million, and estimated six months claims of $3 million, there would remain a net railway operating deficit of $21 million and an adjusted deficit in income available for fixed charges of $11.7 million. Id. at 1005-07. The district court rejected the claim for priority under the "Necessity of Payment" rule on the ground that the rule was not one of priority but of payment, and that it is inapplicable where, as in the present case, no creditor claiming under the rule had demanded payment of its claim as a condition to providing goods or services to the debtor, and the trustees never sought authority to pay the claims. Id. at 1008.
 
 
 18
 * The Six Months Rule was recognized but not given precision of definition in one sentence in Section 77(b) of the Bankruptcy Act, 11 U.S.C. § 205(b) (1976):
 
 
 19
 For all purposes of this section unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors.[15]
 
 
 20
 The Six Months Rule emerged out of the practice of initiating railroad receiverships with an order appointing a receiver and authorizing or directing him to pay from operating receipts certain expenses incurred in the period immediately preceding the receivership. Thus the 1867 receivership order in Gurney v. Atlantic & Great Western Ry., 58 N.Y. 358 (1874), directed the receiver to pay and discharge out of the balance of receipts, after paying the expenses of maintaining and operating the road, arrearages owing to laborers and employees for work in connection with the railway and such sums as were actually due for material and supplies furnished for the use of the company's railways. No general principle, analogous to that in admiralty, was thought to give priority to the last creditors who furnished necessary repairs and supplies to a railroad. Galveston, H. & H. R. R. v. Cowdrey, 78 U.S. (11 Wall.) 459, 480-82, 20 L.Ed. 199 (1871). As the court said in Duncan v. Mobile & O. R. R., 8 F.Cas. 17, 19 (C.C.S.D.Ala.1876) (No. 4,137):
 
 
 21
 The fact that the floating debt was contracted in good faith for the benefit of the railroad company's property, and therefore for the benefit of the bondholders, is true of perhaps all such debts. But that does not give the floating debt creditors any ground upon which to claim that their debt should be paid first.
 
 
 22
 Nevertheless, receivership orders continued to authorize payment of wage and supply claims that accrued over various periods, ranging up to eight months before receivership. E. g. Skiddy v. Atlantic M. & O. R. R., 22 F.Cas. 274, 279-80 (C.C.E.D.Va.1879) (No. 12,922) (reciting terms of 1876 receivership order); Taylor v. Philadelphia & Reading Co., 7 F. 377 (C.C.E.D.Pa.1880) (reviewing terms of several pre-Fosdick receivership orders). On the eve of Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339 (1879), the practice of allowing payment for operating expenses of the pre-receivership period was stated in broad terms in Turner v. Indianapolis, B. & W. Ry., 24 F.Cas. 366 (C.C.D.Ind., S.D.Ill.1878) (No. 14,258); the court observed that generally railroads were dilapidated when receivership started, the first receipts were used to rehabilitate the road, and the pre-receivership claims for labor and supplies were paid by later order; the court emphasized that a railway is a matter of public concern and that public as well as private interests require its continued operation. The court said that its experience
 
 
 23
 ... has satisfied it that practically, it would be well nigh impossible, looking at things as they actually exist, to operate the roads by receivers without some allowance for claims of the character mentioned, existing at the time of their appointment, and that the limitation already stated (i. e., to six months, by analogy to the Illinois lien statute) is not an unreasonable one, in view of all the circumstances.
 
 
 24
 24 F.Cas. at 367. But the court in Turner thought it desirable that the bar obtain from the Supreme Court a decision enunciating some just principle that might be a guide in such cases. Fosdick v. Schall, one of three cases argued and decided together,[16] is said to have been decided "after a general invitation had been extended to the members of the bar of (the supreme) court interested in like cases, to present briefs on the questions arising in that case." See Atkins v. Petersburg R. R., 2 F.Cas. 90, 92 (C.C.E.D.Va.1879) (No. 604).
 
 
 25
 Fosdick v. Schall rejected a conditional vendor's claim for "rent" of gondola cars for the six months preceding and several months following receivership for a number of very sufficient reasons. But the Court sought to establish a basis in principle for the payment of certain pre-receivership claims. The Court commenced by saying that a court, asked by a mortgagee to appoint a receiver in a mortgage foreclosure suit
 
 
 26
 ... in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable.
 
 
 27
 99 U.S. at 251-52.[17] Noting that a railroad foreclosure case is rarely completed without concessions by the parties from their strict legal rights, that much of railroad business is done on credit, and that often debts for "labor, supplies, equipment and improvements" are deferred so that bond interest may be paid and disastrous foreclosure postponed, the Court continued:
 
 
 28
 In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees.
 
 
 29
 Id. at 252-53. Saying that if the mortgagee sought the extraordinary equitable relief of receivership, it had to do equity in order to get equity, the Court continued:
 
 
 30
 We think, also, that if no such order is made when the receiver is appointed, and it appears in the progress of the cause that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies, and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business. This, not because the creditors to whom such debts are due have in law a lien upon the mortgaged property or the income, but because, in a sense, the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and the stockholders; and if they give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. While, ordinarily, this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way. Thus it often happens that, in the course of the administration of the cause, the court is called upon to take income which would otherwise be applied to the payment of old debts for current expenses, and use it to make permanent improvements on the fixed property, or to buy additional equipment. In this way the value of the mortgaged property is not unfrequently materially increased .... Under such circumstances, it is easy to see that there may sometimes be a propriety in paying back to the income from the proceeds of the sale what is thus again diverted from the current debt fund in order to increase the value of the property sold. The same may sometimes be true in respect to expenditures before the receivership. No fixed and inflexible rule can be laid down for the government of the courts in all cases.
 
 
 31
 Id. at 253-54. The Court emphasized that the power to compensate for diversions from the "current debt fund" rests on the fact that mortgage creditors have "got possession" of what in equity belongs to all or some of the general creditors:
 
 
 32
 It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of restoration should be made to depend upon the amount of the diversion.
 
 
 33
 Fosdick's principle, then, is one of mortgage law: that the mortgagee's interest attaches to net income, which arises only after the payment from gross earnings for all necessary operating and managing expenses, proper equipment, and useful improvements, and that, in consequence, to the extent that before or during receivership bonded interest has been paid, additional equipment provided, or lasting and valuable improvements in the mortgaged property have been made out of earnings which ought in equity to have been used to pay debts for labor, supplies and the like, the receivership court can use receivership income or, in some cases, the proceeds of sale of the mortgaged property, to pay the debts that, but for the diversion of funds, would have been paid in the ordinary course of business. Hale v. Frost, 99 U.S. 389, 25 L.Ed. 419 (1879), was decided later in the same term on the authority of Fosdick but without discussion; it approved the payment from net income earned during the receivership of pre-receivership claims for repair parts to equipment and for supplies furnished to the railroad's machinery department. The report is silent concerning any "diversion" of earnings to the advantage of the mortgagee before or during the receivership.
 
 
 34
 Atkins v. Petersburg R. R., supra, professed reliance on Fosdick, but approved the re-payment from income of the receivership of an advance made before receivership to pay arrears of wages in order to avert a strike. There was no reference to "diversion." The court said that:
 
 
 35
 ... it would be difficult to draw a distinction between the principles under which a court authorizes a receiver to make necessary expenses for operating a railroad and keeping it in a safe condition, and the principles embodied in the language quoted from the opinion of the supreme court, relating to sundry expenses of the railroad companies incurred before the appointment of receivers .... It is enough for us that no court has ever refused to issue (receiver's) certificates when it was necessary for repairing the road or keeping it agoing as a safe road; and if it may authorize such expenditures by a receiver, it may pay them if they have been made by the company before the appointment of a receiver.
 
 
 36
 2 F.Cas. at 94. And in Taylor v. Philadelphia & Reading R. R., supra, the court similarly cited Fosdick as justifying a broad order permitting payment from income of claims for "labor, materials, etc., furnished for the operation of the road within five months" preceding receivership, 7 F. at 377-78, and as authorizing the issuance of receiver's certificates for the amounts involved so that the receivers could defer payment in case they found it necessary to apply earnings to protect valuable investments of the railroad.
 
 
 37
 Miltenberger v. Logansport, C. & S. W. Ry., 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882), did not cite Fosdick. The critical issues in the case related to the circuit court's action in authorizing substantial capital expenditures to be incurred, in giving them priority over the first mortgage in a suit brought to foreclose the second mortgage on the road, and in effecting payment for the capital expenditures through first lien receiver's certificates authorized and sold before the first mortgagees sought to foreclose. The Court cited only Wallace v. Loomis, 97 U.S. 146, 24 L.Ed. 895 (1878), the cornerstone case on receiver's certificates, and Barton v. Barbour, 104 U.S. 126, 136, 26 L.Ed. 672 (1881), which cited Wallace v. Loomis for the general proposition that a court of equity may and in most cases ought to authorize the receiver to keep the road in repair and to manage and use it in the ordinary way until it can be sold to the best advantage of all interested. Miltenberger approved the circuit court's order directing immediate payment of interline claims for materials, repairs, and ticket and freight balances, some of which had accrued more than ninety days preceding the receivership, and charging the payments upon the earnings of the road "as with a first lien prior to all incumbrances upon" the railroad. The Court pointed out that the receiver's petition for the order stated that "payment of that class of claims was indispensable to the business of the road, and that, unless the receiver was authorized to provide for them at once, the business of the road would suffer great detriment." 106 U.S. at 311, 1 S.Ct. at 162.[18] The Court said:Many circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property, for the receiver to pay pre-existing debts of certain classes out of the earnings of the receivership, or even the corpus of the property, under the order of the court, with a priority of lien. Yet the discretion to do so should be exercised with very great care. The payment of such debts stands, prima facie, on a different basis from the payment of claims arising under the receivership, while it may be brought within the principle of the latter by special circumstances. It is easy to see that the payment of unpaid debts for operating expenses, accrued within 90 days, due by a railroad company suddenly deprived of the control of its property, due to operatives in its employ, whose cessation from work simultaneously is to be deprecated, in the interests both of the property and of the public, and the payment of limited amounts due to other and connecting lines of road for materials and repairs, and for unpaid ticket and freight balances, the outcome of indispensable business relations, where a stoppage of the continuance of such business relations would be a probable result, in case of non-payment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good-will and integrity of the enterprise and entitle them to be made a first lien,
 
 
 38
 106 U.S. at 311-12, 1 S.Ct. at 162-63. Miltenberger is concerned, not with the "diversion" precept of Fosdick, but with the more general authority of the receivership court to accord priority status to pre-receivership claims in order to prevent the stoppage of a business impressed with the public interest. The case emphasizes the power of the court to effect payment of pre-receivership claims and the validity of the means it chooses to effect payment; the analysis is not in terms of the property interest of operating expense creditors in operating revenues and the limitation of the mortgagee's rights to net income, but it is in terms of paying those pre-receivership expenses that are brought within the principle of administrative expenses by their relation to the continuance of the railroad business.
 
 
 39
 The cases in the Supreme Court involving payment of pre-receivership operating expense claims which were decided in the twenty-odd years between Miltenberger and Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905), preserved the "diversion" principle expressed in Fosdick without losing sight of the separate Miltenberger approach. Union Trust v. Souther, 107 U.S. 591, 2 S.Ct. 295, 27 L.Ed. 488 (1883), allowed a pre-receivership supply claim on Fosdick "diversion" grounds; but the Court noted also that the receivership court's "right to impose terms does not depend alone on whether current earnings have been used to pay the mortgage debt, principal or interest instead of current expenses" (107 U.S. at 594, 2 S.Ct. at 296), citing Miltenberger, and it indicated that the bondholders' election, in their own interest, to leave the loss-making company in possession to operate the road after there had been a default entitling the mortgage bondholders to take possession justified the court's use of receivership income to pay the expenses of pre-receivership operation.[19] Burnham v. Bowen, 111 U.S. 776, 4 S.Ct. 675, 28 L.Ed. 596 (1884), approved the payment of claims for coal furnished for the railroad's locomotives in the months preceding receivership. The Court emphasized that the bondholders permitted the company to possess and manage the road after default and observed that the "maintenance of the road and the prosecution of its business were essential to the preservation of the security of the bondholders." 111 U.S. at 780, 4 S.Ct. at 677. In Burnham the order appointing the receiver did not provide for the payment of pre-receivership operating expenses; however, the Court held that the use of receivership income to pay fixed charges on certain railroad structures, increasing the bondholders' security at the expense of the labor and supply creditors, was a "diversion" within Fosdick. "So far as current-expense creditors are concerned, the court should use the income of the receivership in the way the company would have been bound in equity and good conscience to use it if no change in the possession had been made." 111 U.S. at 782, 4 S.Ct. at 678. The Court in Union Trust Co. v. Illinois Midland Ry., 117 U.S. 434, 6 S.Ct. 809, 29 L.Ed. 963 (1886), was primarily concerned, as in Miltenberger, with the validity and priority of receiver's certificates, but it affirmed the grant of priority in the corpus of the property over the bonds for wages due for the six months preceding receivership. 117 U.S. at 464-65, 6 S.Ct. at 825-26. To an objection that the order appointing the receiver provided only for payment of current operating expenses from current income the Court answered that "the terms of these orders do not impair or exclude the ample authority which the court would otherwise have, and otherwise has, to order the claims in question to be paid out of the property itself, with priority." Id. at 465, 6 S.Ct. at 826. Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U.S. 355, 18 S.Ct. 657, 42 L.Ed. 1068 (1898), affirmed a decree directing that a debt for locomotive coal delivered in the months preceding receivership be paid out of the current earnings in the hands of the receiver; the Court relied on language from Burnham v. Bowen, supra, and Miltenberger, as expressing an "equitable doctrine" the "dominant feature" of which was that a "superior equity" as against the mortgage bondholders, in income earned before and after the receiver's appointment, arises in favor of materialmen who furnish supplies essentially necessary to the continued operation of the railroad in the expectation of payment from current earnings. 170 U.S. at 367-68, 18 S.Ct. at 662. The Court emphasized that, independently of the existence of any pre-receivership "diversion" of income, the equity of the coal company for payment out of income survived into the receivership, attached to the property in the receiver's possession, and, if a surplus of income arose in the receivership, entitled the coal company to demand that the surplus be applied to payment of its claim. Id. at 369, 18 S.Ct. at 662. The existence of that surplus the court found implicit in the fact that during receivership the road's receivers "expended for betterments on its railroad lines from the income of the roads during the receivership a sum much larger than the entire claim" of the coal company. Id. at 367-70, 18 S.Ct. at 662-63. Southern Ry. v. Carnegie Steel Co., 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458 (1900), affirmed a decree according priority payment for rail furnished during a period in excess of six months preceding receivership; the Court inferred that the rail was furnished for ordinary safe maintenance of existing lines;[20] the Court found that current receipts that should have been applied to payment of the steel company's claim had been applied during the receivership for the benefit of the bondholders by paying interest, sinking fund, and car trust debts and for construction and equipment.
 
 
 40
 Circuit court decisions, influenced by Miltenberger, clearly went beyond the Fosdick principle. E. g., Dow v. Memphis & L. R. R., 20 F. 260, 267 (C.C.E.D.Ark.1884); Blair v. St. Louis, H. & K. R. R., 22 F. 471, 472-73 (C.C.E.D.Mo.1884). One case, in the Fourth Circuit Court of Appeals, in which Chief Justice Fuller wrote for the court, allowed the payment from the proceeds of the foreclosure sale of the road of interline claims for freight and freight balances that accrued before the appointment of the receiver. Finance Co. v. Charleston, C. & C. R. R., 62 F. 205 (4th Cir. 1894). There were no surplus earnings before or during the receivership, nor had there been any diversion of income. The court relied on the broad terms of the order appointing the receiver, saying that it could not be construed as limited to payment out of current earnings, "especially in view of the condition of the road." 62 F. at 208. Emphasizing that the payment of such debts was related to the interest in preserving and disposing of the property as a going concern, and to the interest in the road's discharging its public duty, the court said that
 
 
 41
 ... such indebtedness may be given priority, notwithstanding there may have been no diversion of income, or that the order for payment was not made at the time, and as a condition, of the receiver's appointment, the necessity and propriety of making it depending upon the facts and circumstances of the particular case, and the character of the claims.
 
 
 42
 62 F. at 208.
 
 
 43
 The Supreme Court did not sweep so broadly. St. Louis, A. & T. H. R. R. v. Cleveland, C. C. & I. Ry., 125 U.S. 658, 8 S.Ct. 1011, 31 L.Ed. 832 (1888), acknowledged the authority of Fosdick, but it refused to accord priority over the mortgage to a claim for the rental of a leased line. The Court said that the lessor would have to show that the rent arrearage had arisen "by the diversion and misappropriation of the fund that ought to have been applied to its payment to the use and benefit of the mortgage bondholders." 125 U.S. at 674, 8 S.Ct. at 1017. To the extent that the Court impliedly required a showing of diversion before the receivership, it appears to be repudiated in Virginia & A. Coal Co. v. Central Railroad & Banking Co., supra, 170 U.S. at 365, 369, 18 S.Ct. at 661, 662. Kneeland v. American Loan & Trust Co., 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379 (1890), was a case in which there were no surplus earnings before or during the receivership, no receipts were diverted to pay mortgage interest or to improve the road, and the foreclosure sale realized only a fraction of the mortgage debt; the Court held that an unpaid conditional vendor of rolling stock, whose cars were ordered returned to him before the foreclosure sale, would not be granted a priority claim for the reasonable rental value of the cars used during the four months of their use by a receiver appointed upon a judgment creditor's bill, but that such a priority would be accorded to the claims for reasonable rent for use of the cars by a successor receiver appointed at the end of the four months upon the mortgage trustee's foreclosure bill. The Court was critical of "an idea" which "seems to have obtained that a court appointing a receiver acquires power to give such preference (that is, preference over mortgage debts) to any general and unsecured claims." 136 U.S. at 97, 10 S.Ct. at 953. But in the same year the Court in Morgan's L. & T. R. R. & S. S. Co. v. Texas Central Ry., 137 U.S. 171, 197, 11 S.Ct. 61, 69, 34 L.Ed. 625 (1890), although denying priority to the claim before it, broadly restated both the Fosdick principle and that of Miltenberger. And Kneeland v. Bass Foundry & Machine Works, 140 U.S. 592, 11 S.Ct. 857, 35 L.Ed. 543 (1891), distinguished Kneeland v. American Loan & Trust Co., supra, on its facts and as relating to a contract to buy rolling stock in which the vendor reserved title and reclaimed the rolling stock;[21] the Court in Bass Foundry affirmed an order for payment of claims for supplies furnished during the four month period for which the earlier Kneeland decision had rejected the reasonable rental value claim; the Court relied on Fosdick and Miltenberger and on Union Trust Co. v. Souther, supra. Thomas v. Western Car Co., 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663 (1893), again rejected a car vendor's claim for a reasonable rental for the pre-receivership months and cited Kneeland v. American Loan & Trust Co., but it put the decision in large part on the ground that the terms of the contract for the cars demonstrated that the vendor relied on the security of the cars themselves and not on the interposition of a court of equity.[22] 149 U.S. at 112, 13 S.Ct. at 831. Similarly, Penn v. Calhoun, 121 U.S. 251, 7 S.Ct. 906, 30 L.Ed. 915 (1887), and, later, Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U.S. 298, 20 S.Ct. 363, 44 L.Ed. 475 (1900), rejected priority claims where, in the first case, the creditor took as security bonds of the railroad for twice the amount of the claim, and, in the second, the creditor had taken collateral security for part of the debt and had extended and renewed long terms of credit; in neither case could it be found that the creditor relied on the railroad's current earnings for payment.
 
 
 44
 Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905), dealt with Gregg's claim for railroad ties delivered to the railroad in the month preceding the receivership; they were used principally during the receivership to maintain the railroad as a going concern, and the claim for payment was admittedly for a necessary operating expense incurred to keep and use the railroad and preserve the property in fit and safe condition. There had been no diversion of income by which the mortgagee had profited, or otherwise, and, the Court concluded, the circumstances affecting the claim were not "special." The Court said that the claim could not be charged on the corpus of the fund unless there was
 
 
 45
 ... a general rule that such claims for supplies are entitled to precedence over a lien expressly created by a mortgage recorded before the contracts for supplies were made.
 
 
 46
 197 U.S. at 186-87, 25 S.Ct. at 416. The Court said that
 
 
 47
 ... we are of opinion, for reasons that need no further statement, Kneeland v. American Loan & Trust Co., 136 U.S. 89, 97, (34 L.Ed. 379), that the general rule is the other way, and has been recognized as being the other way by this court.
 
 
 48
 197 U.S. at 187, 95 S.Ct. at 416. Of the allowance of pre-receivership claims in Miltenberger, the supplier's principal reliance, the Court said:
 
 
 49
 The ground of such allowance as was made was not merely that the supplies were necessary for the preservation of the road, but that the payment was necessary to the business of the road-a very different proposition.
 
 
 50
 Ibid. Other cases were distinguished as related to the special principle of Miltenberger, or as involving diversion of earnings, and cases like Union Trust Co. v. Souther, supra, where the receivership order authorized payment of six months claims for labor and supplies out of income, were explained as standing
 
 
 51
 ... on the special theory which has been developed with regard to income, and afford no authority for a charge on the body of the fund.
 
 
 52
 Id. at 188, 25 S.Ct. at 416. The cases the Court cited as developing the "special theory" with regard to income are Fosdick, Burnham v. Bowen, supra, Morgan's L. & T. R. R. & S. S. Co. v. Texas Central Ry., supra, Virginia & A. Coal Co. v. Central Railroad & Banking Co., supra, and Southern Ry. v. Carnegie Steel Co., supra. The Court added:
 
 
 53
 It is agreed that the petitioner may have a claim against surplus earnings, if any, in the hands of the receiver, but that question is not before us here.
 
 
 54
 Ibid. The original receivership order in Gregg authorized the receiver to pay material and supply claims which accrued not more than six months before the receivership. Of this provision the Court said:
 
 
 55
 But even if any words in the order authorized a charge on the corpus in order to pay claims like that of the petitioner, or a payment of them except from income, certainly there are none requiring it, or going beyond giving authority to the receiver if, for instance, he thought payments of previous debts necessary to the continued operation of the road.
 
 
 56
 Id. at 188-89, 25 S.Ct. at 416-17.
 
 
 57
 Gregg is the last extended opinion on the Six Months Rule, and on the Necessity of Payment rule in the Supreme Court.[23] The dissent clearly states the more inclusive principle that the Court's majority seemed to reject:
 
 
 58
 And that principle has its foundation in the public interests. A railroad, from its nature and public responsibilities, must be kept a going concern. This is the supreme necessity, and affords the test of the equity invoked for the claims for supplies. It cannot depend upon diversion of income or upon the existence of income. It cannot be confined to debts contracted during the receivership. It may extend to debts contracted before the appointment of the receiver. But recognizing that there must be some limitation of time, the courts have fixed six months as the period within which preferential claims may accrue. And there is no infringement of the rights of mortgagees. Their interests are served, as those of the public are, by keeping the railroad in operation. The limitations of the rule dependent upon the conditions under which supplies are furnished are expressed in Virginia & Alabama Coal Co. v. Central Railroad & Banking Co., 170 U.S. 355 (42 L.Ed. 1068), and in Southern Ry. Co. v. Carnegie Steel Co., 176 U.S. 257 (44 L.Ed. 459).
 
 
 59
 Id. at 196, 25 S.Ct. at 420.
 
 
 60
 Carbon Fuel Co. v. Chicago, C. & L. R. R., 202 F. 172 (7th Cir. 1912), a case in which there was neither surplus earnings nor any diversion of income, interpreted Gregg as limiting Miltenberger to the cases in which not the supply or service furnished to the railroad but payment by the receiver is essential to the continuance of the business of the railroad. See, to the same effect, Taylor v. Delaware & E. R. R., 213 F. 622, 624 (2d Cir. 1914), Moore v. Donahoo, 217 F. 177, 180-83 (9th Cir. 1914), cert. denied, 235 U.S. 706, 35 S.Ct. 283, 59 L.Ed. 434 (1915), Chicago & A. R. R. v. United States & Mexican Trust Co., 225 F. 940, 945 (8th Cir. 1915), and Crane Co. v. Fidelity Trust Co., 238 F. 693, 695-96 (9th Cir. 1916), cert. denied, 244 U.S. 658, 37 S.Ct. 744, 61 L.Ed. 1375 (1917).
 
 
 61
 Pennsylvania Steel Co. v. New York City Ry., 216 F. 458, 470 (2d Cir. 1914), however, referred to Gregg as the "most striking example of the uncertainty which surrounds the whole subject." The Court allowed pre-receivership supply claims against unmortgaged assets of the railway in the absence of any "current debt fund." The court said:
 
 
 62
 If the preference is properly rested on public policy we do not see how it can be restricted to current earnings. Such claimants should be preferred over all general creditors, and if current earnings are not sufficient to secure the preference it should be extended to the company's unmortgaged assets.
 
 
 63
 216 F. at 471. Johnson Fare Box Co. v. Doyle, 250 F.2d 656, 657 (2d Cir.), cert. denied, 357 U.S. 938, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958), paraphrased with apparent approval, a district court's assertion[24] that it is very difficult to discover any principle which would account for all the decisions, and that the only generality obtainable from the cases is that the decision in each depended on its special facts.
 
 
 64
 Southern Ry. v. Flournoy, 301 F.2d 847 (4th Cir. 1962), rejected the theory that Gregg severely limited Miltenberger, 301 F.2d at 852, and emphasized that, from Miltenberger forward, "public concern with the continued operation of the railroad has been a factor supporting the priority accorded general creditors." Id. at 853.[25] The court accorded interline traffic balances and other interline accounts a priority in corpus over the mortgage bondholders. The court treated the time limitation, generally six months, as preventing operating claims from undermining the mortgage through secret liens. Ibid.
 
 
 65
 In re New York, N. H. & H. R. R., 278 F.Supp. 592 (D.Conn.1967), aff'd, 405 F.2d 50 (2d Cir. 1968), cert. denied, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969) ("New Haven"), saw the Six Months Rule as one that over the years had been inconsistently stated and applied in decisions that lacked any harmonizing principle, so that "ambiguities must generally be resolved against those claiming the benefit of the rule." 278 F.Supp. at 595-96. The rule of Fosdick was summarized:
 
 
 66
 Revenues accruing from operations should be paid first to the operations creditors whose materials and services made those revenues possible; and only after all such operational claims have been paid, should the balance be available for the benefit of the mortgagees. If any operating revenues do improperly get into the hands of the mortgagees, equity requires that those revenues be restored to the operations creditors by the mortgagees yielding them a priority. (Footnote omitted.)
 
 
 67
 278 F.Supp. at 597-98. The "surplus earnings" element of the "current debt" or "expense" fund of Fosdick the court defined as the sum of all operating revenues accrued during the six months period and during reorganization and which have actually been received or taken over by the trustee less depreciation and all operating expenses that have actually been paid, or are payable by the trustee, or which constitute administrative expenses.[26] Id. at 599. In New Haven the court found neither "surplus earnings," as it defined them, nor "income available for fixed charges," nor unmortgaged assets, nor any diversion to the mortgagees' advantage of current revenues to which the operations creditors were entitled, since neither the depreciation allowances nor payments on equipment trust and conditional sales obligations could be considered such diversions. Id. at 600-05. The court concluded that the six months creditors could not be accorded a priority in corpus over the mortgage bondholders. The court considered that Flournoy had confused and merged the Six Months Rule and the Necessity of Payment rule, "first enunciated in Miltenberger... by making necessity of payment a requirement of the six months rule and eliminating diversion as a requirement of corpus invasion," directly contrary to Gregg. Id. at 602 n.15. The court, on the supposed authority of Gregg, reduced Miltenberger to the case in which immediate payment is necessary to avert a threat to continued operation of the road, and characterized as "absurd" reliance on the Necessity of Payment rule by creditors whose claims had gone unpaid during six years of operation in reorganization. Id. at 602-03 n.15.[27]
 
 
 68
 In re Tennessee Central Ry., 316 F.Supp. 1103 (M.D.Tenn.1970), vacated on other grounds, 463 F.2d 73 (6th Cir.), cert. denied, 409 U.S. 893, 93 S.Ct. 119, 34 L.Ed.2d 150 (1972), accorded a priority over mortgage bonds to claims for interline freight balances; the court found that the extensions of credit that the balances reflected averted a complete shutdown of the railroad's operation and facilitated the sale of the railroad to three other carriers which continued to operate it. The court relied in part on the special character of interline freight balances as collections for which the road had to account to connecting carriers, 316 F.Supp. at 1110, and ultimately on the circumstance that the connecting carriers' extension of credit preserved the corpus of the mortgaged railroad by maintaining it as a "going concern" and enabled the area formerly served by the railroad to enjoy continued rail services. Id. at 1111. The court argued that Gregg seemed to indicate that, where special circumstances or equities favored six months claimants, their claims might be allowed a priority in assets even in the absence of a diversion of income to the secured creditors' benefit. Ibid.
 
 
 69
 In re Penn Central Transp. Co., 458 F.Supp. 1234, 1319-28 (E.D.Pa.1978), relied principally on New Haven as a distillation of a large number of earlier cases; the "current debt fund," the court said, included surplus income of the six months preceding reorganization as well as for the reorganization period, inclusive of non-rail income customarily made available to support rail operations; generally accepted railroad accounting principles were held applicable, depreciation being deducted from operating revenues in computing the "current expense fund." The deficit in Penn Central's income for the six months period and during reorganization exceeded the depreciation for the same period by very much more than the aggregate of the six months claims; since there was no earnings component for the Fosdick "current debt fund," and capital improvements for the same period (nearly four times the amount of the six months claims) were far less than the depreciation for the period, the court concluded that there was neither enhancement of property nor "diversion."[28] 458 F.Supp. at 1325. The court rejected Flournoy as "discredited" and as impermissibly combining the six months and necessity rules, and treated the Necessity of Payment rule as stating the circumstance in which a court could justify entry of an order authorizing payment of a pre-reorganization creditor who invoked the sanction of refusal to furnish further supplies or services as a means of obtaining payment of his old claim.[29] Id. at 1326-27.B.
 
 
 70
 The persistence of the Six Months Rule and the persistence of two distinct attitudes toward it, the one receptive and expansive, the other insistent upon its limitations and narrow sphere of operation, suggest the co-existence of two essentially different principles, neither of which limits the operation of the other, and both of which may operate in the same reorganization to embrace many of the same claims. The Fosdick rule is one of equitable restitution; in receivership the mortgagee must restore to operating creditors revenues diverted to the mortgagee's advantage; the lien of the mortgage extends to railroad revenue or income only when possession of the road and its income is demanded, pursuant to the mortgage terms after default, Fosdick, supra, 99 U.S. at 253; Gilman v. Illinois and Mississippi Telegraph Co., 91 U.S. 603, 617, 23 L.Ed. 405 (1876); Galveston, H. & H. R.R. v. Cowdrey, supra, 78 U.S. (11 Wall.) at 482-83, and the lien reaches only what remains of revenue after payment of all current operating expenses. Burnham v. Bowen, supra, 111 U.S. at 782-83, 4 S.Ct. at 678. The receivership furnishes the occasion and judicial means of effecting the equitable restitution, but mortgage law, not the special principles governing the administration of railroad receiverships, is the source of the right to restitution.
 
 
 71
 The second rule, elaborated and applied in Miltenberger, is peculiarly a principle of railroad receivership law, reflecting the view that a "railroad is authorized to be constructed more for the public good to be subserved, than for private gain .... It is ... a matter of public right by which the courts, when they take possession of the property, authorize the receiver ... in whose charge it is placed to carry on in the usual way those active operations for which it was designed and constructed, so that the public may not receive detriment by the non-user of the franchises." Barton v. Barbour, 104 U.S. 126, 135, 26 L.Ed. 672 (1881). Miltenberger, relied on Wallace v. Loomis, supra, 97 U.S. at 162-63, for the authority to issue receiver's certificates superior to the first mortgage lien to finance the payment of pre-receivership operating expenses, administrative expenses of the receiver and costs of new construction, and relied on Barton v. Barbour for the public interest justification for continued operation of the railroad as a going business. 106 U.S. at 309-12, 1 S.Ct. at 160-162. The Court said that payment of pre-receivership debts
 
 
 72
 ... where a stoppage of the continuance of such business relations would be a probable result, in case of nonpayment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good-will and integrity of the enterprise, and entitle them to be made a first lien.
 
 
 73
 Id. at 312, 1 S.Ct. at 162. The Court's rationale excludes the inference that only those creditors are entitled to priority of payment who demand immediate payment as a condition of continuing to supply a service or commodity of which they are monopolists.[30] The Court was defining the classes of claims payment of which was indispensable to the business of the road and which, "unless the receiver was authorized to provide for them at once, the business of the road would suffer great detriment." Id. at 311, 1 S.Ct. at 162. The Court's depiction of the disastrous consequences of failing to pay labor claims-a work stoppage[31]-or interline claims-a stoppage of traffic interchange-is directed to restricting the class of claims entitled to priority of payment to claims for those goods and services that are indispensable to the continued performance of the transportation service. The point is to single out the pre-receivership expenses the payment of which although it-prima facie -may stand on a different principle from that governing payment of administrative expenses, "may be brought within the principle of the latter by special circumstances." Ibid. The test is not whether the claimant has the naked power to exert economic duress, but whether the expenses have the characteristics of those that the receiver pays from revenue as expenses of administration or pays out of the proceeds of the sale of first lien receiver's certificates. E. g., Boston & Maine Corp. Trustee's Competitive Bidding Exemption, 347 I.C.C. 234, 235 (1971). (Sale of certificates "for meeting payroll and other expenses which, if not met, would preclude continued provision of essential railroad transportation services.") An early district court decision, authorizing the issuance of receiver's certificates, summed up the principle:
 
 
 74
 It is enough for us that no court has ever refused to issue (receiver's) certificates when it was necessary for repairing the road or keeping it agoing as a safe road; and if it may authorize such expenditures by a receiver, it may pay them if they have been made by the company before the appointment of a receiver.
 
 
 75
 Atkins v. Petersburg R.R., supra, 2 F.Cas. at 94.
 
 
 76
 Some decisions have, very evidently, read Gregg as reducing Miltenberger to a Necessity of Payment holding in the starkest economic duress form,[32] but Gregg is, rather, circumspect in its treatment of Miltenberger ; it preserves the ambiguity of the Miltenberger language without explaining or applying it, and declines to find that Gregg's facts presented special circumstances warranting priority. The Supreme Court has since cited Miltenberger for the principle that claims with equities superior to the mortgagee's "may be accorded priority in payment although they arose prior to the receivership." Carpenter v. Wabash Ry., 309 U.S. 23, 28, 60 S.Ct. 416, 418, 84 L.Ed. 558 (1940).
 
 
 77
 The criterion of priority to have intrinsic validity must be found in the nature of the claim and in the nature of the reorganization. If the claim is for a service or supply indispensable to the maintenance and operation of the railroad, and if the railroad continues to operate while in reorganization, the real difficulty is in finding a ground on which a court can fairly deny payment of a pre-reorganization expense claim indistinguishable from current administration expenses that are being paid and indistinguishable from kindred operating expenses that were incurred in the ordinary course of business by the railroad company in the months preceding reorganization and were paid by the railroad before reorganization or were paid thereafter by the trustees as liabilities arising out of the operation of the railroad. If a claim has the generally accepted characteristics of a six months claim, as stated in the district court's opinion, 468 F.Supp. at 1002, that is, (1) it represents a current operating expense necessarily incurred, (2) was incurred within six months before the reorganization petition was filed, and (3) the goods or services were delivered in the expectation that they would be paid for out of current operating revenues of the railroad, and not in reliance on the road's general credit,[33] it will inevitably be for an expense indistinguishable from and essentially contemporaneous with expenses paid by the railroad before reorganization, and will be indistinguishable from currently paid administration expenses. The singularity of the claim will not be either in the goods or services which it represents, nor in their contribution to the railroad's service to the public, nor in their contribution to the preservation of the fabric of the railroad, but only in the fact that it will, of course, not be paid. No principle marks current expenses paid in ordinary course on the eve of reorganization as preferences, but denial of an equivalent right to priority payment for expenses of the same kind likewise incurred on the eve of reorganization introduces an inequality of treatment that finds no justification either in the principles on which businesses are continued in operation during receivership, or in the mortgagee's lien interest. The desideratum is equality of treatment for the current operating expenses of a railroad enterprise the operations of which have continued without interruption of service, revenues and expenses. That equality is readily achieved by recognizing administration expenses as extending backward to the period preceding reorganization to the extent necessary to assure that there is continuity in the payment of indispensable operating expenses without reference to the date the petition is filed so long as the current expenses of the pre-reorganization period that are brought forward for payment conform to the strict standard established for administration expenses of the current operating class, and are not so dated as to forbid the conclusion that they are in fact current. The inequity in treatment arising out of the accidental circumstance of non-payment before the filing of the petition is eliminated.
 
 
 78
 The hostility to "six months" claims evident in Gregg, supra, 197 U.S. at 186-87, 25 S.Ct. at 416 and New Haven, supra, 278 F.Supp. at 596,[34] is no doubt in some part a product of the uncertain limits of the class of claims: six months is not an inflexible time limit, and each case "must depend largely upon its special facts," Southern Ry. v. Carnegie Steel Co., supra, 176 U.S. at 292, 20 S.Ct. at 360; the "surplus earnings" and the quantum of "diversion" relevant under Fosdick are puzzling concepts, id. at 294-95; In re Penn Central Transp. Co., supra, 278 F.Supp. at 598-601; reliance on the general credit of the railroad seems an illusory concept, Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U.S. 298, 316-17, 20 S.Ct. 363, 369-370, 44 L.Ed. 475 (1900) (security taken upon renewal of notes given for rail); Southern Ry. v. Carnegie Steel Co., supra, 176 U.S. at 292, 20 S.Ct. at 360 (if first notes given for rail contemplated payment from current earnings, seller "lost no equity merely by renewing the notes"); Penn v. Calhoun, 121 U.S. 251, 252, 7 S.Ct. 906, 907, 30 L.Ed. 915 (1887) (bank took bonds of railroad to secure repayment of loan). But the definition of the class has been left to the courts by the Congress,[35] and when the time comes to determine membership in the class[36] it will be for the reorganization court to determine what claims belong in the class because they represent indebtedness for ordinary and necessary current operating expenses indispensable to continued rail service of the kinds being paid currently as expenses of administration; whether the non-payment reflects an intentional extension of credit to the railroad, or the intervention of the reorganization petition before expiration of the ordinary billing and payment period, or some noncontractual indulgence or inadvertence on the part of the claimant, or deferment of payment on the part of the railroad; and whether, if the transaction giving rise to the claim had any credit term, it was compatible with a general expectation of payment from current receipts or indicated reliance on the railroad's general credit. In any event, it must be concluded that the class of creditors entitled to the priority contemplated by Section 77(b), 11 U.S.C. § 205(b) (1976), is not limited to participation in the current debt (expense) fund defined in terms of Fosdick equitable restitution, but extends to participation in reorganization railway operating revenues essentially on the same basis as administration expenses incurred during the reorganization period.
 
 C.
 
 79
 Where payment for pre-reorganization services and supplies is claimed on the ground that the expenses are within the principle governing the priority accorded to administration claims, questions respecting the existence of a current expense or debt fund, that is, of surplus earnings or net income, are not directly involved; the controlling considerations are those taken into account in authorizing administration expenses.
 
 
 80
 However, if payment is claimed under the Fosdick principle, the existence of a current debt fund must be demonstrated. The district court's analysis of the financial data, 468 F.Supp. at 1002-04, 1005-07, establishes that there were no surplus revenues but a deficit in operating income and income available for fixed charges in the period from September 13, 1969, to July 31, 1978, and that the operating deficit exceeded the amounts arguably expended to the mortgagee's advantage. However, in its analysis the district court defined the earnings (deficit) component of the current expense fund as comprising revenues less operating expenses and depreciation, id. at 1003; the court rejected the argument that providing an allowance for depreciation out of revenue enhanced the mortgaged assets and so was a diversion, id. at 1006-07; it indicated approval of the New Haven view that depreciation reflects the consumption of the railroad property through use, and that the depreciation allowance is comparable to expenditures made merely to preserve and not to increase the mortgaged assets. Ibid. See New Haven, supra, 278 F.Supp. at 604; In re Penn Central Transportation Co., supra, 458 F.Supp. at 1324-25; note 28, supra.
 
 
 81
 Certainly the depreciation of income producing property, the exhaustion of its utility over the years of its useful life, is an objective fact.[37] It is, however, not related to ordinary repair and maintenance; it relates to the exhaustion of useful life despite regular repairs and maintenance. Depreciation is by its nature indelibly a capital charge, the cost, allocated to the accounting period, of the capital used to produce the revenue of that period. If the depreciation reserve is considered an accumulating fund, and not simply a record of the annual postings of fractions of the original capital cost, it is a fund accumulated to restore the original capital investment in money, or to provide a new capital asset. But the annual charges to revenue for depreciation of capital assets do not create a fund in specie that preserves the identity and stands in place of the depreciable asset and is subject to any mortgage that there may be on the asset. There is no suggestion that, here, the railroad did, or that, generally, railroads do undertake with their mortgage bondholders that they will use an amount equal to annual depreciation to make good-if that could be done-the physical depreciation of the mortgaged property. Something roughly like that may no doubt occur in good times as a portion of earnings each year is reinvested in the road, but such reinvestments are capital outlay for new assets themselves depreciable, and that the new investments may not exceed the depreciation charges of the same period means only that-assuming constant prices-the road is losing old capital values through use faster than it is acquiring new capital assets. In good times new capital assets acquired will often, perhaps usually, come under the after-acquired property clauses of the mortgage, and the long term mortgagee will have a kind of slowly revolving security.[38] But first to last depreciation is related to capital, its exhaustion, and its replacement, not to its maintenance, and it is not an expenditure that affects cash flow of the accounting period.
 
 
 82
 The Boston and Maine accounts recorded an aggregate net railway operating loss in the period September 13, 1969, to December 31, 1977, of $42.5 million, and of that $33.2 million represented charges for depreciation. That amount could not represent a diversion of revenues to the mortgagee's advantage for the all-sufficient reason that it was not a current expenditure in any sense. If in the same period revenues were used for capital expenditures and to retire secured obligations (supra page 12), they were so used whether or not depreciation charges were made, and they had the special significance that Fosdick attaches to such expenditures, quite without reference to the amount of depreciation currently charged. Fosdick is concerned with the priority in operating revenues owed to current operating expenses. To rank depreciation charges equally with current operating expenditures in their claim upon revenue is to reject the priority that Fosdick recognized. The mortgage does not extend to the assets plus the depreciation reserve built up over the years against the assets, but only to the wasting asset itself. When in receivership the Fosdick principle intervenes, the priority of current operating expenses in revenue precludes any deferment to depreciation charges that, if allowed in the Fosdick calculation, would be a direct set-aside of revenue for the mortgage bondholders at the cost of the current-expense creditors. No ground exists for allowing depreciation in a Fosdick calculation of earnings that would not as a logical corollary require trustees' certificates to share their lien rank with the sum of the depreciation allowances recorded since March 12, 1970, for, in the ultimate sense, trustees' certificates, to the extent that they do not rest on "free assets," are a charge on the revenues from which expenses of administration, in considerable part current operating expenses, are paid.
 
 D.
 
 83
 The district court rejected the appellants' contention that the Necessity of Payment rule is a rule of priority and accepted the conclusion of New Haven, supra, 278 F.Supp. at 603 n.15, that the rule is not based on considerations of equity but is a device for handling a threat to the continued operation of the railroad during reorganization. 468 F.Supp. at 1008. To the extent that a strict necessity of payment rule has developed from the cases it would not be a rule conferring a right of recovery on the claimant but a rule of exculpation, protecting the trustee who paid under economic duress for a supply or service indispensable to continued operation of the railroad. See In re Penn Central Transportation Co., supra, 458 F.Supp. at 1326 ("By definition, the necessity of payment rule is one to be invoked by Trustees, as justification for their decision to pay these unsecured pre-bankruptcy claims.") Under this distinct rule the district court was clearly right in its conclusion that, since no creditor claiming under that rule had insisted on payment of its claim as a condition of providing goods and services to the debtor, and since the trustees had never sought authority under the rule for payment of any such claims, the rule was inapplicable and the claims under it groundless.
 
 E.
 
 84
 To summarize on this second aspect of the case, we hold:
 
 
 85
 1. The Fosdick principle, essentially one of equitable restitution on principles of mortgage law, and the special principle of receivership administration that emerged in Miltenberger are co-existing but distinct principles.
 
 
 86
 2. The Fosdick principle of equitable restitution provides for payment of claims for pre-reorganization current operating expenses from and to the extent of the existence of a current debt fund determined essentially as indicated in New Haven and in In re Penn Central Transportation Co., supra, 458 F.Supp. at 1322-23, except that depreciation is not deductible in determining the amount of the income component of the current debt fund.
 
 
 87
 3. The Miltenberger receivership-administration principle provides for payment of claims on the same basis and from the same operating income as administration expenses for pre-reorganization current operating expenses that satisfy the strict requirements of the class, that is, that they are claims for necessary current operating expenses not furnished in reliance on the railroad's general credit.
 
 
 88
 4. The Necessity of Payment rule, as it has emerged as a distinct third principle, does not confer rights on claimants; it rather reflects the existence of a judicial power to authorize trustees in reorganization to pay claims where such payment is exacted as the price of providing goods or services indispensably necessary to continuing the rail service, and it reflects the existence of a corollary judicial power to exculpate trustees who may have made such payments in exigent circumstances without first obtaining authorization by court order.
 
 III
 
 89
 It follows from what has been said that the order of the district court of March 19, 1979, must be reversed in so far as it failed to provide a separate class of creditors, with priority pursuant to Section 77(b) of the former Bankruptcy Act, 11 U.S.C. § 205(b) (1976), now 11 U.S.C. § 1171(b), and in all other respects affirmed.
 
 
 90
 Reversed in part, affirmed in all other respects, and remanded for further proceedings consistent with this decision.
 
 
 
 *
 Sitting by designation
 
 
 **
 Of the Eastern District of New York, sitting by designation
 
 
 [1]
 The appeals of the Committee of Interline Railroads and of Trailer Train Co. have been withdrawn. No briefs have been submitted in support of the appeals of Penn Central Transportation Company and Atchison, Topeka and Sante Fe Ry. The appeals of the Chesapeake and Ohio Railway Company, et al., and of Canadian Pacific present the issues concerning the classification of the per diem claims of the interlining railroads for the period August 1, 1953, through July 31, 1969, as well as of the railroads' claims for per diem car hire, car repairs and loss and damage for the six months preceding the date on which the involuntary petition was filed against the Boston and Maine. The appeals of Maine Central Railroad Company and Portland Terminal Company and of Eastern Associated Coal Corporation relate to the classification of claims for per diem car hire, freight loss and damage and overcharge, car repairs, and diesel fuel for the six months preceding the filing of the petition
 
 
 [2]
 The district court decision recounts the sequence of proceedings leading to the ICC's fixing of per diem rates in 1968. See 456 F.Supp. at 413 n.2
 
 
 [3]
 49 U.S.C. § 1(17)(a) provides that if "any carrier, receiver, or operating trustee" fails or refuses to comply with any order or direction of the ICC as to car service it shall be liable to stated penalties, recoverable in a civil action brought by the United States. Citations are to the Interstate Commerce Act, as amended, 49 U.S.C. § 1 et seq. (1976). Parallel sections respecting car service are now comprised in 49 U.S.C. § 11121 et seq
 
 
 [4]
 The court found in the terms of the Bankruptcy Reform Act provision, 11 U.S.C. § 1166, a resolution of any supposed contradiction between Section 77(c) (2) and Section 77(l ) in the requirement that both the ICC and the reorganization court approve payment for both pre- and post-reorganization per diem charges. The Congress in adopting Section 1166 rejected a Senate provision requiring the debtor to pay in cash current balances owed other carriers for interlining charges, including incentive per diems, for periods both before and after the filing of the petition
 
 
 [5]
 The background and course of the litigation are outlined in the district court's decision in the "immediate payment" case, In re Boston & Maine Corp., 456 F.Supp. at 413 n.2
 
 
 [6]
 In the suit to recover from the Boston & Maine and other railroads the difference between the amounts paid and the higher charges fixed by the Association of American Railroads, the district court deferred to the ICC's determination of the reasonableness of the AAR rates. Baltimore & O. R. R. v. N. Y., N. H. & H. R. R. Co., 196 F.Supp. 724, 748-49 (S.D.N.Y.1961). The ICC decision, Chicago, B. & Q. R. R. v. New York, S. & W. R. R., 332 I.C.C. 176 (1968), fixing rates for the period commencing October 1, 1968, and making findings on the reasonableness of the rates for the 1953-1968 period, was sustained, Boston & M. R. R. v. United States, 297 F.Supp. 615 (D.Mass.), and Union Pacific R. R. v. United States, 300 F.Supp. 318 (D.Neb.), both aff'd, without opinion, 396 U.S. 27, 90 S.Ct. 196, 24 L.Ed.2d 142 (1969)
 
 
 [7]
 See note 6
 
 
 [8]
 The railroads also cite Chicago, M. & St. P. R. R. v. Wisconsin, 238 U.S 491, 35 S.Ct. 869, 59 L.Ed. 1423 (1915), in which the Court invalidated a Wisconsin law which provided that whenever a person engaged a lower berth in a sleeping car and the upper berth in the same section was neither engaged nor occupied, the upper berth should not be let down but should remain closed until engaged or occupied. The divided court held that the statute was not a reasonable exercise of state police power but a taking of property without compensation. The statute, like the short line rule, mandated a transfer of a value without compensation in money or justifying social value
 
 
 [9]
 Government of Guam v. FMC, 329 F.2d 251, 254 (D.C.Cir.1964), and Pan American World Airways, Inc. v. CAB, 256 F.2d 711 (D.C.Cir.1958), reach the same result on parallel facts. Government of Guam spoke of the result as deriving from "the compelling obligation of the carrier to render public service."
 
 
 [10]
 An order giving effect to the findings of Rules for Car-hire Settlement was entered in Rules for Car-hire Settlement, 165 I.C.C. 495 (1930), aff'd in part, reversed in part, Chicago, R. I. & P. Ry. v. United States, 284 U.S. 80, 52 S.Ct. 87, 76 L.Ed. 177 (1931)
 
 
 [11]
 For the history of the ICC decision see note 6, supra
 
 
 [12]
 Boston & Maine R. R. v. United States, 162 F.Supp. 289, 295 (D.Mass.), appeal dismissed, 358 U.S. 68, 79 S.Ct. 107, 3 L.Ed.2d 34 (1958), is to the same effect
 
 
 [13]
 More recent decisions have sustained further ICC action respecting interchange of cars. United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), approved as reasonable under Section 1(14)(a) two car service rules promulgated in 1969 by the Commission which required freight cars, after being unloaded, to be returned in the direction of the lines of the road owning the cars. The Court, reviewing the car service history of the railroads, said that, "The freight cars of the Nation thus became in essence a common pool, used by all roads." Id. at 743, 92 S.Ct. at 1944. And in Ann Arbor R. R. v. United States, 368 F.Supp. 101, 112-13 (E.D.Pa.1973), aff'd without opinion, 419 U.S. 807, 95 S.Ct. 23, 42 L.Ed.2d 36 (1974), the courts sustained the Commission's incentive per diem rules under the 1966 amendment to Section 1(14)(a)
 
 
 [14]
 The district court held that Six Months Rule creditors were not entitled to a priority in unmortgaged assets; the court declined to follow dicta indicating a contrary assumption in In re New York, N. H. & H. R. R., 278 F.Supp. 592, 598 (D.Conn.1967), aff'd, 405 F.2d 50 (2d Cir. 1968), cert. denied, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed. 776 (1969), and in In re Penn Central Transp. Co., 458 F.Supp. 1234, 1321 n. 81 (E.D.Pa.1978). 468 F.Supp. at 1007-08
 
 
 [15]
 When first enacted in 1933, 47 Stat. 1474, the provision appeared in Section 77(c), and the first part read:
 For all purposes of this section claims against a railroad corporation which would have been entitled to priority over existing mortgages if a receiver ...
 The language of the 1978 Act, 11 U.S.C. § 1171(b), is the same in substance as that of Section 77(b).
 
 
 [16]
 The two cases argued with Fosdick v. Schall did not deal with the Six Months Rule, but followed Fosdick v. Schall in holding that the lien of the railroad mortgage did not extend to cars, Fosdick v. Car Company, 99 U.S. 256, 25 L.Ed. 344 (1879), or locomotives, Huidekoper v. Locomotive Works, 99 U.S. 258, 25 L.Ed. 344 (1879), purchased under contracts of conditional sale
 
 
 [17]
 The 1875 receivership order in the Fosdick foreclosure directed the receiver to pay all debts due for labor and services rendered within the preceding three months and all debts for "engines, iron, wood, supplies, cars, or other property purchased within said period of three months for the use of the company."
 
 
 [18]
 The master who passed on the claims "disallowed several items in the receiver's accounts, claimed under the above heads, where the claims were made on the ground that the creditors threatened not to furnish any more supplies on credit unless they were paid the arrears." 106 U.S. at 311, 1 S.Ct. at 162. The next sentence appears to refer to the master's action in disallowing the claims rather than to the receiver's action in paying them. "His action, sanctioned by the court, in allowing items within the scope of the orders of the court appears to have been careful, discriminating and judicious, so far as the facts can be arrived at from the record. It cannot be affirmed that no items which accrued before the appointment of a receiver can be allowed in any case." Ibid
 
 
 [19]
 Union Trust Co. v. Walker, 107 U.S. 596, 2 S.Ct. 299, 27 L.Ed. 490 (1883), decided with Souther, held that a purchaser of claims of "six months" creditors could enforce the claims, not because the creditors had a lien on the property and income but "because in equity the earnings of the company constitute a fund for the payment of the expenses which their claims represent, before any income arises which ought to be applied to the discharge of the mortgage debt." 107 U.S. at 596, 2 S.Ct. at 299
 
 
 [20]
 A claim for extraordinary quantities of rails furnished before the receivership but outside the ordinary course of business, and for construction rather than repair, was not accorded priority. Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U.S. 298, 315-16, 20 S.Ct. 363, 369, 44 L.Ed. 475 (1900); Hale v. Frost, supra, disapproved priority payment for pre-receivership supplies furnished to the road's construction department while approving such payment for repair parts and for supplies so furnished to the road's machinery department
 
 
 [21]
 Virginia & A. Coal Co. v. Central Railroad & Banking Co., supra, distinguished Kneeland v. American Loan & Trust Co. on essentially the same ground. 170 U.S. at 370-71, 18 S.Ct. at 663
 
 
 [22]
 Virginia & A. Coal Co. v. Central Railroad & Banking Co., supra, treated Thomas as decided on the ground that the car company relied on the responsibility of the railroad company and not on the interposition of a court of equity. 170 U.S. at 371-72, 18 S.Ct. at 663, 664
 
 
 [23]
 Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 471 n.5, 94 S.Ct. 2504, 2507, n.5, 41 L.Ed.2d 243 (1974), refers to the priority language of Section 77(b), to Gregg as to that priority, and to St. Louis & S. F. R. R. v. Spiller, 274 U.S. 304, 311, 47 S.Ct. 634, 637, 71 L.Ed. 1060 (1927), as stating the general six months limitation on Fosdick claims. New York Dock Co. v. S. S. Poznan, 274 U.S. 117, 121, 47 S.Ct. 482, 484, 71 L.Ed. 955 (1927), stated the Fosdick principle as requiring payment for supplies furnished before receivership where the debtor's or receiver's use of them "has produced the earnings;" the Court considered the result to flow from the courts' self-imposed duty to require that, before distribution, expenses that have contributed to the preservation or creation of the fund in its custody should be paid
 
 
 [24]
 In re Third Avenue Transit Corp., 138 F.Supp. 623 (S.D.N.Y.1955), aff'd on opinion below, 230 F.2d 425 (2d Cir. 1956). Third Avenue Transit treated pre-receivership operating expense claims as enjoying priority only in net income of the railroad and of the receiver
 
 
 [25]
 The court noted its earlier statement in Virginia Passenger & Power Co. v. Lane Bros., 174 F. 513, 516 (4th Cir. 1909), that in certain cases preferential payments have been allowed out of corpus. "One of the foundations of the principle is that the public interest requires that a railroad must be kept a 'going concern.' It does not depend, therefore, upon the diversion, or even upon the existence of income."
 
 
 [26]
 The court differentiated its treatment of the six months earnings ("gross operating income" taken over and collected by the trustee less expense items payable on the date the petition was filed which the trustee was required to pay) from the scheme referred to in Guaranty Trust Co. v. Albia Coal Co., 36 F.2d 34, 36 (8th Cir. 1929), that is, "gross operating income taken over or collected by the receiver less taxes accrued." 278 F.Supp. at 599
 
 
 [27]
 The Court of Appeals affirmed, 405 F.2d 50 (2d Cir. 1968), saying that the "current expense fund" for six months claims "is to be computed by deducting operating expenses and depreciation from current revenues." 405 F.2d at 52
 
 
 [28]
 The trustee evidently argued that $770 million spent on capital improvement should not be considered in the "diversion" calculation because the expenditure did not exceed the increase in depreciation reserve through charges to income in the period. The six months creditors apparently argued that this was "double dipping," taking depreciation into account twice, once to compute surplus earnings and a second time to absorb the capital expenditures' effect as a diversion to the advantage of the mortgage bondholders. The court sought to meet the argument with the statement that, if the amount of depreciation charged had actually been spent to make good the depreciation, that outlay "would not thereby have enhanced the mortgaged assets at the expense of the six months claimants." 458 F.Supp. at 1375. That, however, is, logically, a restatement of the conclusion that depreciation should be deducted in computing the earnings component of the Fosdick "current debt fund." The court met the argument directly by concluding that even adding back the depreciation did not produce Fosdick surplus earnings, leaving the capital expenditures in large part unexplained, however. Ibid
 
 
 [29]
 The court said that In re Penn Central Transp. Co., 467 F.2d 100 (3d Cir. 1972), correctly stated the Necessity of Payment doctrine. The appellate court summarized the Necessity of Payment rule, an "exception to the normal deferment of payment of pre-reorganization claims until their disposition can be made part of a plan of reorganization," as permitting immediate payment where creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims are paid. 467 F.2d at 102 n.1. The appellate court intimated that a reorganization court might well have power to compel a continuance of a service sought to be withheld in order to coerce payment of an old claim. Id. at 102
 
 
 [30]
 As noted above, footnote 18, the special master disallowed "several items" where the claimants threatened "not to furnish any more supplies on credit unless they were paid the arrears." 106 U.S. at 311, 1 S.Ct. at 162
 
 
 [31]
 In Skiddy v. Atlantic, M. & O. R.R., supra, 22 F.Cas. at 281-82, the court, acting on such a ground, directed the receiver to pay eight months back wages to those employees only who continued in employment; claims of the remaining employees and claims for materials supplied under contracts made on the eve of receivership were denied priority. The district judge who joined in the Skiddy opinion evidently regarded it as overruled in its latter aspect by Fosdick. Atkins v. Petersburg R.R., supra, 2 F.Cas. at 92
 
 
 [32]
 With one exception, later cases in the Supreme Court that cited Miltenberger relied also on the equitable restitution principle of Fosdick. Virginia & Alabama Coal Co. v. Central Railroad & Banking Co., supra, 170 U.S. at 365-66, 18 S.Ct. at 611; Illinois Midland Ry., supra, 117 U.S. at 456-58, 6 S.Ct. at 821-22; Union Trust Co. v. Souther, supra, 107 U.S. at 594, 2 S.Ct. at 296. The exception is Kneeland v. Bass Foundry & Machine Works, supra, 140 U.S. at 596-97, 11 S.Ct. at 858-59, where the claim was ordered paid out of corpus because the supplies covered by the claim "had been necessary to the continued operation of the road, and had gone into the general property covered by the mortgage" and "contributed to the preservation of the property during the receivership." Neither a surplus of earnings nor a diversion was involved
 
 
 [33]
 To the same effect are In re Penn Central Transp. Co., supra, 458 F.Supp. at 1321; In re New York, N.H. & H. R.R., supra, 278 F.Supp. at 596; Guaranty Trust Co. v. Albia Coal Co., supra, 36 F.2d at 35
 
 
 [34]
 In contrast is the support for a broad receivership principle approach successively evident in Finance Co. v. Charleston C. & C. R.R., supra, 62 F. at 208, the dissent in Gregg, supra, 197 U.S. at 196, 25 S.Ct. at 420, and Flournoy, supra, 301 F.2d at 851-52. The paragraph by which Chief Justice Waite introduced the discussion of priorities in Fosdick, supra, 99 U.S. at 251-52, is more easily referred to the broad receivership principle later elaborated in Miltenberger than to the narrow principle of equitable restitution that the following paragraphs of the opinion outline
 
 
 [35]
 The Commission on the Bankruptcy Laws of the United States, Report, H.R.Doc.No. 93-137, 93d Cong., 1st Sess. (1973), reprinted in King, Klee and Levin, Collier on Bankruptcy (15th Ed.), Appendix, Vol. 2, Part I, p. 270, recommended retaining the "so-called six-month priority rule according to creditors who supplied necessities to the debtor within six months prior to the filing of the petition the status of administrative expense claimants." The Commission's recommended bill, in the "Confirmation of Plan" section (9-503), included a requirement that the plan provide "for payment of all allowed claims for current operating expenses incurred by the debtor during the six months immediately preceding the filing of the petition." Id., Part I, p. 288. The Senate in 1978 would have followed the Commission recommendation to provide that "traditionally accorded" priority (S.Rep.No. 95-989, 95th Cong., 2d Sess. 135-36, reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 5787, 5921-22), and S. 2266, 95th Cong., 1st Sess. § 1173(a)(9) (1978), required that the "Plan" include a provision for payment in cash of all allowed claims for current operating expenses during the six months preceding the filing of the petition. The House Bill, H.R. 8200, 95th Cong., 1st Sess. (1977), which in substance proposed to continue, as Section 1170(b), the language of former Section 77(b), and H.R.Rep.No. 95-595, 95th Cong., 1st Sess. 424, reprinted in (1978) U.S.Code Cong. & Admin.News, p. 6380, stated that "As under current law, the courts will determine the precise contours of the priority recognized by this subsection in each case." The provision enacted as 11 U.S.C. § 1171(b) follows the House Bill and substantially continues the language of Section 77(b)
 
 
 [36]
 Since the district court disposed of the six months claims on the ground that there was no current debt fund, 468 F.Supp. at 1003, and no diversion, id. at 1004-06, and did not designate a priority classification for six months creditors, id. at 1008, the court did not refine its definition of the class, id. at 1002, nor set out the limitations on membership in such a class
 
 
 [37]
 When Fosdick was decided some railroads at least charged certain classes of additions and betterments to revenue, see Union Pacific R.R. v. United States, 99 U.S. 402, 420-22, 25 L.Ed. 274 (1879), and until the 1920s "retirement accounting" was common, that is, no annual depreciation charges were made against revenue, but when capital assets were retired their original cost was charged to revenue in the year of retirement. See Depreciation Charges of Telephone Companies, 118 I.C.C. 295, 302-03, 305-07 (1926) (outlining railroad practices and position); Illinois Central R.R. v. I.C.C., 206 U.S. 441, 461-63, 27 S.Ct. 700, 706-707, 51 L.Ed. 1128 (1907); cf. Kansas City Southern Ry. v. United States, 231 U.S. 423, 445-48, 34 S.Ct. 125, 132-33, 58 L.Ed. 296 (1913) (railroad arguing unsuccessfully that, where new roadbed and track replaced short section of old roadbed and track in order to improve grade and speed and reduce cost of service, the abandonment cost of the old track did not have to be charged to revenue)
 
 
 [38]
 Uniform System of Accounts for Railroad Companies, 309 I.C.C. 289 (1959), approved the railroads' dispensing with retirement and depreciation accounting for track maintenance; observing that the useful life of the composite track structure is semipermanent in the sense that, when properly maintained, the end of its life span is unforeseeable, the I.C.C. concluded that no good purpose would be served by requiring retirement and depreciation accounting for track so long as the railroads continued to maintain existing track in proper condition through adequate replacement, as needed, of rails, ties, ballast and other material so that deterioration in track structure and impairment of the corporation's capital investment was avoided. 309 I.C.C. at 292, 296. Track maintenance illustrates the revolving security concept